## SECURITY REALTY & DEVELOPMENT CO. et al. v. BUNCH et al.

### No. 3697.

Court of Civil Appeals of Texas. Beaumont.

June 27, 1940.

Rehearing Denied Sept. 25, 1940.

D. E. O'Fiel, of Beaumont, and D. C. Bland, of Orange, for appellants.

W. G. Reeves and King & Rienstra, all of Beaumont, for appellees.

O'QUINN, Justice.

As tried in the lower court, this was an action by appellant Mrs. David E. O'Fiel, claiming the property as her separate property, joined by her husband, David E. O'Fiel, against appellees C. T. Bunch et al., for partition of the McGuire Chesson survey of 262 acres of land in Orange county; appellants claimed an undivided ⅕th interest in the survey. Appellees answered by demurrers, general and special denial, pleas of ten year limitation, estoppel, and res adjudicata based upon the judgment rendered in Howth & O'Fiel v. Taliaferro, No. 20890 on the docket of the trial court, affirmed by this court, Howth et al. v. Taliaferro, Tex.Civ.App., 289 S.W. 119, writ refused. The issues in the case at bar were identical with the issues in Howth v.

Taliaferro, except that Mrs. O'Fiel in the case at bar was a party by name, claiming the ⅕th undivided interest as her separate property. The case at bar was tried upon the very issues submitted to the jury in Howth v. Taliaferro, which were as follows, and which were answered in this case as in Howth v. Taliaferro, that is, the jury answered question No. 1 in the negative, and question No. 2 in the affirmative. We give the issues:

"Issue No. 1

"Do you find from a preponderance of the evidence there was a delivery to the grantee, H. L. Gray, of the deed introduced in evidence of date the 1st day of April, 1873, wherein Jef Chaison and James Chaison are grantors and H. L. Gray is grantee and recorded on the 28th day of December, 1921?

"Issue No. 2

"Do you find from a preponderance of the evidence that W. F. Taliaferro, during his lifetime, under whom the defendants herein claim, or those under whom he claimed had been in continuous, peaceable and adverse possession of the land in controversy, or any part thereof, cultivating, using or enjoying the same for a period of ten consecutive years prior to the institution of this suit on September 24, 1934?"

On the verdict, judgment was entered against appellant, from which she has prosecuted her appeal to this court.

We take the following statement of the case from appellees' brief: "During the year 1922, R. W. Howth, and David E. O'Fiel, claiming to own a part of the McGuire Chesson Survey in Orange County, Texas, sued W. F. Taliaferro in Cause No. 20890, in the District Court of Jefferson County, Texas, to partition said survey. The defendant, W. F. Taliaferro, filed an answer and cross-action in said case on December 9, 1922, suing O'Fiel and Howth for all of said Chesson Survey. On December 30th, 1922, and during the pendency of said suit, David E. O'Fiel took a deed from H. L. Gray, Jr. conveying to him the one-fifth interest involved herein in the Chesson Survey and retaining a vendor's lien to secure the payment of a $520.00 note, a part of the purchase price. During the month of June, 1925, the plaintiffs, David E. O'Fiel and R. W. Howth, having filed a plea of 'not guilty' to the cross action of W. F. Taliaferro, the case

came on for trial before a duly empanelled jury to which jury only two special issues were submitted, the first being whether or not a deed signed by Jeff and James Chaison to H. L. Gray, dated April 1, 1873, and acknowledged only by James Chaison, and recorded on December 30, 1921, was delivered to H. L. Gray, Sr., the second issue being ten years limitation, both of which issues were answered by the jury in favor of W. F. Taliaferro, and upon the verdict of the jury a judgment was rendered on July 18, 1925, in favor of W. F. Taliaferro against R. W. Howth, David E. O'Fiel and all intervenors in said cause, for all the McGuire Chesson Survey of 262 acres, which judgment was affirmed on October 28, 1926, by this Honorable Court and reported in Vol. 289 S.W., Page 119, and Writ of Error was denied by the Supreme Court."

For further explanation of the nature and facts of this case, we refer to the statement made in Howth v. Taliaferro, and adopt the statement therein made as a part of the statement herein.

H. L. Gray, Jr., claimed through H. L. Gray, the grantee in the deed submitted to the jury by question No. 1, and appellant claimed only through H. L. Gray, Jr.

As explaining appellees' title, we take the following additional statement, supplementing the statement made above, from appellees' brief: "The evidence is undisputed that Hugh E. Gray was the only son of Caroline Chesson Gray, the first wife of H. L. Gray, Sr., and that his mother's title descended to him. Hugh E. Gray, by deed of March 16, 1894, conveyed 248 acres in Orange County known as the McGuire Chesson Survey to Clara Landry, through whom appellees by mesne conveyances, and the judgment against David E. O'Fiel, R. W. Howth, and others rendered in Cause No. 20890, in the District Court of Jefferson County, Texas, July 18th, 1925, now claim the land. Charles J. Chaison, a son of Jeff Chaison stated in his oral testimony that he heard a discussion among his family as to a partition of the Chesson Estate, that he never heard of his father making any claim to the McGuire Chesson Survey, that in regard to a partition of the McGuire Chesson Estate he heard a discussion as to the McGuire Chesson 262 acre Survey in Orange County, Texas; that it was a discussion with the Chaison family, that he found out from his mother in discussing it with her about the division of the estate.

that the McGuire Chesson Survey in a partition of the estate of McGuire Chesson went to Caroline Gray, the wife of H. L. Gray, Sr."

■ On the jury's answers to question No. 1, H. L. Gray never had any title to the McGuire Chesson Survey, but the title was vested in his wife, Caroline Chaison Gray, as her separate property, and no title descended from H. L. Gray to his son H. L. Gray, Jr. Therefore, appellant acquired no title through H. L. Gray, Jr.

But appellant challenges the sufficiency of the evidence to support the verdict on issue No. 1. The following testimony given by Judge George C. O'Brien, on the trial of Cause No. 20890, in our judgment, supports the verdict:

"This instrument which you hand me, I have examined and it purports to be a deed by James Chesson and T. J. or Jeff Chesson to H. L. Gray, Sr. I knew H. L. Gray, Sr., in his lifetime. During his lifetime my father and the firm with which he was associated and I was associated represented him and I attended to it. * * * I think the original of this deed which I now have in my hand from him and T. J. or Jeff Chesson to H. L. Gray, Sr., was in the Clerk's office. About 1901 or about the time of the oil boom those papers were transferred to O'Brien and O'Brien's office and since about 1906 it has been there with my papers. That is, I got the custody of it in 1906. All those papers were filed away there in a safe. I was employed to settle up the estate. There was some friction between Mrs. Allen and her husband and H. L. Gray and the boys, and she wanted to sell her interest and move away. The heirs would not buy it. Yes, I represented them. As their legal representative, I had copies of deeds, documents, etc., pertaining to the estate. This paper which I hold came into my possession as I have explained. * * * I am sixty-three years old. Captain Geo. W. O'Brien was my father. He was known as Captain O' Brien. I think I became associated with him about 1890 or 1889. He died in 1909. * * * I knew of this deed which I hold in my hand of McGuire Chesson to H. L. Gray prior to the death of my father. He died in 1909. Yes, I recall about the date it came from the clerk's office to my father's office; it must have been somewhere between 1901 and 1902 or 1903. My recollection is that it was during the oil boom. As to knowing it to be a fact, I

know it in this way. I used to be a deputy clerk way back under L. L. Miller. He was District and County Clerk, they did not have offices separated at that time. I remember a great bundle of old deeds; some of them unrecorded. They were in the clerk's office and I only remember that old bundle of deeds. Afterwards, I saw that bundle of deeds and recognized them in our office. Yes, they were in our office. Some were recorded and some were not. This was an unrecorded deed. Now, as for seeing this particular deed in the clerk's office, I have no recollection of that. I just saw a bundle of old deeds and recognized that bundle in our office, and out of that bundle came that deed. Yes, from about 1901 to 1921 or a period of twenty years, the deed remained either in the custody of my father or myself. Yes, unrecorded in our office. No, I know nothing of the circumstances surrounding the execution of that deed. * * * To the best of my recollection Mr. H. L. Gray died in the summer of 1902; it may have been a little later, but it was during the oil boom. The date of the Lucas Gusher was the 10th of January 1901. Yes, subsequently I represented the estate of H. L. Gray, Sr. in the administration in the county court. I think possibly Mr. Bland started out to represent them and Mr. Duff represented Mrs. Allen and they were about to bring suit for partition and then Lawsy got me to settle things up. I don't know why this land in controversy was not inventoried as a part of his estate; so far as I was concerned, I never thought about this land when I was administering the estate and I don't know why it was not inventoried. I don't know that I represented the estate at the time the inventory was made. I think maybe Mr. Bland was representing them. I have no definite recollection just now at what stage I took charge of the estate. * * * This bunch of papers that was found in the clerk's office was a bunch of miscellaneous papers and not all H. L. Gray's papers. I don't recall any other instrument of H. L. Gray's except this in that bunch from the clerk's office, but I did not look for any other. Those papers were not in H. L. Gray's file; they were miscellaneous papers or deeds. They were both recorded and unrecorded. A few of them were recorded, I think. * * * Yes, I remember Wilber F. Gilbert, He was County and District Clerk for many years. I think he ceased to hold the office about 1882. He went into partnership with my

father. My recollection is that about 1900 or 1901 this batch of old unrecorded papers found their way to the office of myself and father. Mr. Gilbert had no connection with our office at that time. * * *"

In our opinion, 289 S.W. 119 will give a complete analysis of Judge O'Brien's testimony.

The following testimony supports the verdict of the jury on the issue of ten year limitation; this testimony was reproduced from the statement of facts in Howth v. Taliaferro, supra, as being the testimony given by the witness Thompson and W. F. Taliaferro. The witness Thompson testified: "I lived consecutively in that house for five years and a little over. That I know, I can answer that question directly and conscientiously. After I moved on the McGuire Chesson land, I cleaned it up and dug a well, built a barn and fenced the land and cultivated it. I cultivated it five years straight and if my memory serves me right, I cultivated it the sixth year, after I moved on my own place that I bought from Dr. Taliaferro, but for five years I cultivated it—that I know. After I had stayed there and made five crops I moved on my own place, probably a mile east and I think I went back the sixth year and planted some stuff. Yes, on the Chesson. I know some parties moved in there after I left there, but I can't give you the date. My son, for quite a little bit, he was there before I moved away and I left him there until he built his house on the land we bought from the doctor. Yes, my son was in the house part of the time and another man was there quite a little bit, taking care of my stuff. I did not move all my stuff right away and I got this fellow to stay there, him and his wife. His wife's name was Ella, that is all I can tell you about it. I left my chickens and hogs until I could get fixed. Yes, I knew Spoonmore at that time. He was a single man, but he had a brother-in-law by the name of Lem Couser, he moved on there and run a shingle mill. When I took the balance of my stuff, he moved in the house I built. I could not say positive how long they stayed in the house, but to the best of my knowledge must have been nearly two years. * * * The enclosure I had around, well the first house I built was 14x24 and the second was 15x20 or 24. Yes, I built that house on the McGuire Chesson Survey. The first one I built in 1909 and that house was 14x24. It was a

one-story house, a box house. It was a shingle roof. I made the shingles, they were split shingles and I made the boards; the 2-ft boards. I suppose the enclosure covered about ten or twelve acres. I never measured to see, I am just guessing at it Judge. The house faced South, that is one of them did. Yes, the first one I built faced the South. The rear end fronted the North. I don't know how far from the house the north string of fence was, I never measured to see. I suppose I could give you some idea, possible 40, 50 or 60 feet maybe 70 feet. I don't know. I will make my own estimate that I built the house about sixty feet from the fence. That is from the North side of the house to the north string of fence. Yes, I guess you are right, the north string of fence run east and west. I suppose that north string of fence was about seventy or eighty panel. There was about eight feet to the panel. Yes, I think that north string of fence was fully six hundred and forty feet long. I never measured it, because I never thought about it that way. * * * No, I don't think I lived on the McGuire Chesson Survey over five years, that is not permanently lived there, but I had control of it for six years. Yes, I lived there five years, I am sure of that. * * * After I left that house didn't remain vacant at all. It wasn't vacant from the time it was built until it began to rot down, so far as I know. The sills of the house rotted out from under the whole house. * * * That house rotted down four or five years ago. * * * Yes, after I left, Mr. Spoonmore and Mr. Couser moved in on the place and run a shingle mill on the west towards the Bayou. Spoonmore and this other man lived in that house between one and two years, in my opinion, I couldn't tell you positively. After they left, there was a fellow batched there for a while, but it was after Spoonmore left."

The witness Taliaferro testified: "I was interested with my father in the purchase of this land from King about the time the papers were drawn up. Before I went into the deal, the title was taken in his name, but I really had an interest in the Chesson all the time. My father made an investigation to the title to this land at the time it was purchased. When I purchased the land which I believed in good-faith from what I understood the facts to be, that I was getting the title of H. E. Gray to the 248 acres of land through H. E. Gray. I have since that time been holding and claiming the entire McGuire Chesson tract of land. Since that time I have been in possession. From the time I purchased this land or from the time that my father purchased it, up until the filing of this suit in 1922, there were no interruptions or any claims had to the land. When I purchased the land there were a lot of old back taxes that had not been paid. They have now been paid up through 1921. All that have accrued since I took it, all back taxes through 1921. They were paid by myself. Yes, I know Thompson who testified here. I made arrangements with him through Mr. Bunch to go on that land as my tenant. I made these arrangements through Mr. Bunch, my agent. I don't know when Thompson actually went on the land, but he was there when we bought the land in 1910. I was up on our land somewhere in the summer of 1910; that was the first time I say Mr. Thompson. I knew we could furnish the lumber to build a house. Yes, his house was built then. He was on there before my father under whom I am claiming held record title to the land. He was on the land there for King. He was on there for King prior to that time. He either built that house in the late winter or early spring of 1910, shortly after we acquired title to the land. I don't think he built the house before we bought the land. He was in a shack before we bought the land, but shortly after we got it he built the house. The date I purchased that land was in February 1910 or January 1910. Shortly after the date of this deed, we made arrangements with Thompson to remain on there as our tenant, and we furnished him the lumber and as soon as possible he built the house himself. Yes, that was in 1910. Yes, he did some other kind of improvements. He cleared and fenced the land and built a barn and chicken house and dug the well and improved it. After he built the house he and his family occupied it. Thompson stayed there through the flood of 1915. He was working two places. He was clearing the land that he had bought and getting that ready to move over there and his family was divided. I think he had a couple in this house and his family lived over there or vice versa, but he was working both places when the flood came in 1915. I think in August 1915. After Thompson left, we made arrangements with a little shingle mill to go over and cut cypress, a man by the name of Bill Spoonemore and Lem Couser. They paid stumpage on the cypress that they cut

692

there at the mill. I am not sure whether they cultivated any garden or patches of any kind while they were there. They stayed on the Chesson and lived in that house about two years. I remember distinctly that when they were about ready to move away that one of them remained there for awhile and helped Mr. Ashworth make posts to build that small fence around the old Thompson field. While they were operating this shingle mill, they didn't cultivate this old field and the fence around the old field was practically gone. Well, when they were about ready to leave, Mr. Ashworth had moved to the other place below the slough on the Armstrong and wanted to cultivate this place and I paid for the posts that Spoonemore or Couser cut to build this fence and had a three wire rail fence. Yes, one of these men was occupying the house while Ashworth was preparing and building the fence. Yes, Ashworth cultivated a portion of that. He built the fence in the first summer he was there. He was there in 1917 and I am not sure he cultivated that summer, I don't think he did that summer. I know it was started in Bermuda grass and we let that grass grow until the fall and that fall we turned some cows and heifers in on winter grass for pasture. That was the time old man White was living there and a man by the name of Ferguson. After the shingle outfit moved out, an old man by the name of White lived there. I don't know how long, but for several months, but immediately after he moved out, two men, a man named Ferguson and another man went on there, with my permission. Ashworth cultivated that land two years. He planted peanuts there for two years, that was in the summer of 1918 and 1919. The cultivation was enclosed by this fence that he and Couser and Spoonemore built. Those crops were in 1918 and 1919. In 1920 I had them enclose the whole thing. I had those heifers and those things were increasing over there and I had gotten quite a few cattle together and they were well bred fancy cattle, and some good milch cows and I decided I either had to go in the dairy business or sell some cows. Yes, I made a mistake and went into the dairy business, I haven't gotten out yet. I am still in it."

We add that in Howth v. Taliaferro, we affirmed the verdict of the jury that the deed to H. L. Gray had not been delivered, and its affirmative answer to the issue submitting ten year limitation.

The evidence does not support appellant's proposition that W. F. Taliaferro, and those claiming through him, during the limitation period "admitted and acknowledged the existence of title in other alleged co-owners of the land in controversy." The record supports the following statement from appellees' brief on this issue: "Dr. W. F. Taliaferro, at the time he took the quitclaim deeds from the heirs of James Chaison, was claiming the title to the entire survey by virtue of the deed from Hugh E. Gray, the only son of Caroline Gray, to whom, according to the testimony of Charles J. Chaison, the entire survey had been allotted in the division of the McGuire Chesson Estate. Dr. Taliaferro, in the trial of the case of O'Fiel and Howth v. Taliaferro, No. 20890, testified that he believed he had the title to the land, but not all the record title, that his father, a lawyer, advised him to perfect the record title to prevent somebody from digging up a lost deed and suing."

The court did not err in receiving in evidence the tax receipts offered by appellees showing payment of taxes by them on the land in controversy, and evidence showing that appellant had not paid any taxes on the land.

We give appellants' seventh proposition: "The trial court erred in admitting before the jury the testimony of George C. O'Brien, W. P. Thompson and W. F. Taliaferro upon the issue of limitation, and of alleged non-delivery of deed given in another suit, wherein said parties testified but in which the plaintiff, Mrs. Violet G. O'Fiel was not a party, because, not having been a party, the plaintiff, Mrs. O'Fiel, the real party at interest in this suit, did not have the opportunity to cross examine such witnesses, nor being otherwise bound by such judgment."

As a predicate for the admission of the testimony of Judge O'Brien, it was shown that he was physically and mentally unable to testify, and as a predicate for the admission of the testimony of the witness Thompson and Taliaferro that they were both dead. This was a sufficient predicate. City of Beaumont v. Kane, Tex.Civ.App., 33 S.W.2d 234.

As explaining appellants' relation to this suit, we supplement the statements given above from appellants' brief by the following additional statement:

"The note executed by David E. O'Fiel to H. L. Gray, who claimed to hold title

under the alleged deed to H. L. Gray, Sr., for $520.00 as a part of the purchase price for said deed from Gray to O'Fiel, and upon which suit was brought by J. B. Yost et al to establish the indebtedness and foreclose the vendor's lien upon the land covered by the deed from H. L. Gray to David E. O'Fiel bore the following endorsements:

" 'Vendor's lien note, for value received, I hereby sell, transfer and assign to the order of Geo. C. O'Brien the within note, together with the vendor's lien on the property securing the same, and as Indorser I guarantee the payment of the within note at maturity, or on demand, at any time after maturity, waiving demand, protest and notice of protest and notice of nonpayment thereof.

" 'H. L. Gray
" 'George C. O'Brien
" 'John S. Yost.'

"George C. O'Brien, by written instrument, transferred the vendor's lien note and lien to F. M. Yost, whose sons on December 8, 1927, brought suit against David E. O'Fiel thereon to establish the debt against David E. O'Fiel and to foreclose the vendor's lien. In which suit, Cause No. 29827, in the District Court of Jefferson County, Texas, David E. O'Fiel, by his answer entered a general denial, and impleading H. L. Gray on his warranty, alleged among other things as follows: 'That the said H. L. Gray, at and prior to December 30th, 1922, the date of his said deed to the defendant, David E. O'Fiel, was not possessed of an indefeasable title to said land but on the contrary that the said land and title thereto was owned and held by one W. F. Taliaferro and thereafter, to-wit: sometime about June 30th, 1925, upon a trial had in the District Court of Jefferson County, Texas, between the said W. F. Taliaferro on the one hand the said David E. O'Fiel and the others interested with him, the said W. F. Taliaferro recovered of the said defendant, David E. O'Fiel, the said land and premises described in the plaintiff's said petition on file and the whole of said land; that thereby the title of the said H. L. Gray conveyed to David E. O'Fiel wholly and completely failed and the consideration moving from the said David O'Fiel to the said H. L. Gray became entitled to be refunded to the said David E. O'Fiel, that demand has been made of the said H. L. Gray by defendant, David E. O'Fiel, for the payment to him of the said sums due on said cause of action but that said H. L. Gray has wholly failed and refused and continues to fail and refuse to pay the same or any part thereof to the damage of the said David E. O'Fiel the sum of $780.00.'

"Upon a trial of said cause, judgment was rendered on September 13, 1928, in favor of J. B. and H. C. Yost against David E. O'Fiel for the debt owing on the note in the sum of $653.81, and foreclosing the lien on the one-fifth interest, and David E. O'Fiel in his cross-action recovered judgment against H. L. Gray on his warranty for the sum of $780.00 with interest. An order of sale was issued on the judgment rendered in favor of the Yost brothers, and a deed was made by the sheriff of Orange County, Texas, on February 25, 1929, to C. W. Bolton for $75.00 conveying all of the estate, right, title and interest which David E. O'Fiel had on December 30, 1922, or at any time afterwards in and to an undivided one-fifth interest in the McGuire Chesson Survey.

"C. W. Bolton, the father-in-law of David E. O'Fiel and the father of Mrs. O'Fiel, the plaintiff herein, stated in his deposition that in February, 1929, he was living with his daughter, Mrs. O'Fiel, that he went over to the sheriff's sale with Mrs. O'Fiel, who told him of the sale and suggested that he buy in at the sale, and that he did buy the land and turned it in to the Security Realty & Development Company upon the suggestion of his daughter, Mrs. O'Fiel, that he depended on Mr. O'Fiel to transact the business for him. He refused to state what he received for the land.

"David E. O'Fiel testified he had been married to Mrs. Violet G. O'Fiel for 25 years, that said marriage relations still exist, and that he had been president of the Security Realty & Development Company from its organization until it ceased to function, that the stock of said company was owned by Mrs. O'Fiel and himself. * * *

"David E. O'Fiel and Violet G. O'Fiel made a deed to the Security Realty & Development Company on November 28, 1925, and recorded November 30, 1925, in Orange County, Texas, conveying the McGuire Chesson Survey, after the judgment had been rendered in favor of W. F. Taliaferro in Cause No. 20890, and before suit was filed by the Yost brothers against O'Fiel to establish the debt and foreclose the lien."

On this statement, it is our conclusion that appellant Mrs. O'Fiel bore such a relation to Cause No. 20890 as to make the testimony of the witnesses, Judge O'Brien, Thompson and Taliaferro, as given in Cause No. 20890, admissible against her on the trial of the case at bar. The test of admissibility of testimony given in a former trial rests upon the identity of the subject matter, the identity of the issues, and the practical or representative identity of the parties, and the opportunity to cross-examine the witnesses on the former trial upon the same issue as that upon which the evidence is offered on the second trial. McCormick and Ray on Evidence, § 453; Texas Employers Ins. Ass'n v. Burnett, Tex.Civ.App., 77 S.W.2d 742; Traders' & General Ins. Co. v. Baldwin, Tex.Civ.App., 50 S.W.2d 863; Wharton on Evidence, Art. 177; Wigmore on Evidence, § 1388.

On the verdict of the jury, appellant had no title under H. L. Gray to the land sued for because there was no delivery of the deed to H. L. Gray, Sr. The verdict of the jury on the issue of limitation bars all other titles through which she could claim. On these conclusions the judgment of the lower court should be affirmed.

It is also our conclusion that the judgment in Cause No. 20890, affirmed by this court in 289 S.W. 119, constitutes res adjudicata against appellant on all titles litigated in the case at bar. This conclusion also supports the judgment.

Affirmed.