ROOT REFINING CO. v. UNIVERSAL OIL PRODUCTS CO.

AMERICAN SAFETY TABLE CO. v. SINGER SEWING MACHINE CO.

Nos. 5546, 5648, 6459.

Circuit Court of Appeals Third Circuit.

July 6, 1948.

Ralph S. Harris and John R. McCullough, both of New York City, and Adam M. Byrd, of Chicago, Ill. (Dwight, Harris, Koegel & Caskey and Frederick W. P. Lorenzen, all of New York City, on the brief), for Universal Oil Products Co.

Leslie Nichols and Allen C. Holmes, both of Cleveland, Ohio, for William Whitman Co., Inc.

George B. Clothier, of Philadelphia, Pa., Edwin M. Otterbourg, of New York City, and Leon J. Obermayer, of Philadelphia, Pa., for American Safety Table Co.

Synnestvedt & Lechner, Newton A. Burgess, John F. Ryan and Reginald Hicks, all of New York City, for Singer Sewing Machine Co.

H. G. Morison, Asst. Atty. Gen., and Roy C. Hackley, Jr., and Alfred C. Aurich, Sy. Assts. to Atty. Gen., for the United States of America.

Before SOPER and MAHONEY, Circuit Judges, and PRETTYMAN, Associate Justice of United States Court of Appeals for the District of Columbia, Sitting by Designation of the Chief Justice of the United States, FRED M. VINSON.

SOPER, Circuit Judge.

This proceeding relates to the integrity of the judgments of this court in certain patent infringement suits, that is, two companion cases, Nos. 5648 and 5546, Root Refining Company v. Universal Oil Products Company, June 26, 1935, 78 F.2d 991, and also No. 6459, American Safety Table Company v. Singer Sewing Machine Company, March 9, 1938, 95 F.2d 543. It is asserted that these judgments are invalid and should be vacated because in each case there was a corrupt and illicit conspiracy to obstruct justice between J. Warren Davis, one of the former judges of this Court, and Morgan S. Kaufman, one of the attorneys for the successful litigant; and that in each case the successful litigant was party to the unlawful combination. The two Universal cases were one for all practical purposes and were so treated at the time they were tried in the District Court and in this court. The trial of the charges respecting the judgments therein was consolidated by us with the trial of like charges respecting the judgment in the American Safety Table Company v. Singer Sewing Machine Company case, since much of the evidence was common to both cases.

Nos. 5546 and 5648. Root Refining Company v. Universal Oil Products Company.

Universal Oil Products Company was owned one-half by the Standard Oil Company of California and one-half by the Shell Oil Company. It was the owner and licensor of certain patents for the production of gasoline from petroleum, on which patents its suits against Root Refining Company were based; and Universal was also the plaintiff in other infringement suits, in respect to the same patents, against other oil companies in various parts of the United States. The instant proceeding had its inception at an informal hearing in this court on June 5, 1941, before certain judges of this court who were not members thereof when the judgments under examination were rendered.

On that date the attorneys for the defendants in the other suits brought by Universal appeared in this court and charged that the judgments in Root Refining Company v. Universal Oil Products Company were invalid for the reasons outlined above, and that these judgments were being used in the other cases as a precedent or as res judicata with respect to the validity of the patents. Universal was represented by attorneys at this hearing, but Root was not, since it did not desire to reopen the case and disturb an agreement with Universal entered into in the early part of 1939, whereby Root acquired a license under the patents, before the investigation of the charges against Davis and Kaufman had been begun.

Davis and Kaufman were tried under an indictment to obstruct justice in the District Court of the Eastern District of Pennsylvania between May 19 and May 29, 1941, and the trial resulted in a disagreement of the jury.[1] The attorneys who attacked the judgments in this court at the hearing on June 5, 1941, alleged that the evidence then recently offered at the first criminal trial indicated that Davis had been bribed by Kaufman to secure a decision favorable to Universal in the Root appeals; and they suggested an investigation of the matter but, as their clients were not parties in the cases, they expressed doubt as to their capacity to participate. The presiding judge of the court thereupon suggested that they serve as amici curiae, and accordingly, they accepted this role.

Thereafter, petitions were filed by the attorneys in which as amici they asked the court to appoint a master to investigate the Root appeals, stating at the same time that they were also concerned with the interests of their clients in suits which Universal had brought against them. Universal, on its part, while denying the fraud, offered to consent to a reargument of the Root cases without disturbing its agreement with Root even though Universal should prevail in the reargument;

but this offer was not accepted. On November 26, 1941, the court appointed a master and authorized and directed him to examine, investigate and report to the court his conclusions concerning the relationship between Universal, Morgan S. Kaufman and Judge Davis in connection with these cases and particularly whether the judgments of this court therein were tainted and invalidated by fraud. He was directed to receive relevant documents and evidence in the possession of the United States Department of Justice, its Bureau of Investigation, and United States Attorneys, and to inspect the federal grand jury proceedings in New York and Philadelphia. He was given power to summon and swear witnesses, and subject them to the examination and cross examination of the attorneys. It was further ordered that the fees and expenses of the master should be first paid by the amici, and ultimately taxed against them or Universal as the court might direct.

The master took the testimony of numerous witnesses who were sworn and subjected to examination by the amici and by the attorneys of Universal; and the master also examined records in the possession of the United States Attorney in New York, the records of the proceedings of the grand jury in Philadelphia and other records and statements, in the absence and without assistance of the attorneys. On October 19, 1943, he reported his conclusion that the judgments of the Circuit Court of Appeals in the Root appeals were tainted and invalidated by fraud. The nature of his work is described in Universal Oil Co. v. Root Refining Co., 328 U.S. 575, 66 S.Ct. 1176, 90 L.Ed. 1447, wherein the Supreme Court considered the propriety of certain fees which had been allowed by this court to the amici for their services. The Supreme Court said: (328 U.S. at pages 578, 579, 66 S.Ct. at page 1178)

"* * * He examined records in the possession of the United States Attorney for the Southern District of New York, the records of proceedings before a Phila-

---

[1] A second trial upon the indictment took place between July 28, 1941 and August 21, 1941, and also resulted in a disagreement.

delphia grand jury, bank records, and various statements of interested parties. From this mass of material, he selected those documents which he deemed appropriate for submission to the inspection of the amici and of counsel for Universal. Witnesses were also heard and petitioner was given the right to cross-examine. * * * Petitioner's (Universal's) counsel duly excepted to the manner in which the investigation was being conducted, 'if it were to involve any property rights of our clients, including the validity of any judgment. * * *' The master evidently did not view the proceedings in the light of an adversary litigation. He ruled 'that the investigation—for that is all it is—should [not] be conducted strictly according to the rules of evidence in litigation.' At the conclusion of this investigation, the master rendered a report in which he concluded 'that there was in connection with this case such fraud as tainted and invalidated the judgments' in the Root appeal."

Exceptions to the master's report were filed by the amici and by Universal but on June 15, 1944, after hearing, the court overruled the exceptions, adopted the findings and conclusions of the master, vacated the judgments of June 26, 1935, recalled its mandate and restored the cases to the reargument list. 62 U.S.P.Q. 114. No attempt to review this order was made. Thereafter application was made by the amici for the allowance of costs, disbursements and fees, and after a hearing an order was passed on December 29, 1944, wherein the amici were allowed $100,000 for their services and the additional amount of $54,606.57 as reimbursement for their out-of-pocket expenses. Root Refining Co. v. Universal Oil Products Co., 3 Cir., 147 F.2d 259. These amounts had in fact been already paid to the amici by their oil company clients, and the awards therefore constituted an order for the reimbursement to the clients by Universal. With respect to this order a writ of certiorari was sought and granted, and when it was considered by the Supreme Court,

this court's order was reversed.[2] In passing on the question, the Supreme Court made the following statement which directly bears upon the power and duty of this court as now constituted in conducting the present proceeding. We refer particularly to portions of the statement which we have emphasized. The court said (328 U.S. at page 580, 66 S.Ct. at page 1179, 90 L.Ed. 1447, June 10, 1946):

"*The inherent power of a federal court to investigate whether a judgment was obtained by fraud, is beyond question.* Hazel-Atlas Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250. The power to unearth such a fraud is the power to unearth it effectively. *Accordingly, a federal court may bring before it by appropriate means all those who may be affected by the outcome of its investigation. But if the rights of parties are to be adjudicated in such an investigation, the usual safeguards of adversary proceedings must be observed.* No doubt, if the court finds after a proper hearing that fraud has been practiced upon it, or that the very temple of justice has been defiled, the entire cost of the proceedings could justly be assessed against the guilty parties. Such is precisely a situation where 'for dominating reasons of justice' a court may assess counsel fees as part of the taxable costs. Sprague v. Ticonic National Bank, 307 U.S. 161, 167, 59 S.Ct. 777, 780, 83 L.Ed. 1184. *But, obviously, a court cannot deprive a successful party of his judgment without a proper hearing.* This question is not before us, except as it bears on the order allowing attorneys' fees and costs. But if the judgment could not be nullified without adequate opportunity to be heard in a proper contest, neither is it just to assess the fees of attorneys and their expenses in conducting an investigation where petitioner throughout objected to the character of the investigation if it was to be used as a basis for adjudicating rights."

On December 19, 1946, after the case had been returned to this court, Universal called this court's attention to the comments of the

---

[2] Without objection the court had previously allowed the master $25,000 for his services and for his expenses.

Supreme Court upon the master's procedure in conducting the investigation and filed a motion to vacate the order of June 15, 1944, whereby the judgments in the Root appeals had been vacated. On June 20, 1947, after counsel had been heard, this court vacated the order of June 15, 1944, but at the same time ordered Universal to show cause why said judgment should not be vacated by reason of fraud or corruption practiced upon this court by it or those acting upon its behalf. The court also authorized the Attorney General of the United States to appear in the proceeding as amicus curiae.[3] It thus appears that after the expiration of six years, this proceeding was returned to the point at which it began on June 5, 1941. The subsequent proceedings were as follows:

On July 1, 1947, Alfred C. Aurich, Special Assistant to the Attorney General, appeared as attorney for the United States, amicus curiae, and thereupon the former amici withdrew. On September 18, 1947, Universal petitioned the Supreme Court for a writ of certiorari and for writs of mandamus and prohibition to forbid further proceedings in the instant case on the ground that there was no justiciable case or controversy before the court, and on November 10, 1947, the Supreme Court denied these petitions. 332 U.S. 813, 68 S.Ct. 145.

On December 26, 1947 the Senior Judge of this court certified that by reason of the volume, accumulation or urgency of business in this circuit, or the disability or necessary absence from the circuit of one or more Circuit Judges, the court was unable to perform speedily the work before it and on January 16, 1948, the Chief Justice of the United States designated and assigned the judges of the court now sitting herein to act as Circuit Judges in this circuit and discharge all of the duties of the Circuit Judges thereof in connection with cases Nos. 5546 and 5648, Root Refining Company v. Universal Oil Products Company, and case No. 5649, American Safety Table Company v. Singer Sewing Machine Company.

On December 31, 1947, William Whitman Company, Inc. petitioned for leave to intervene in this proceeding, stating that Universal had sued Whitman's predecessor, the National Refining Company, for infringement of the patents involved in the Root appeals and on the strength of the judgments therein, had induced its predecessor to take a license under the patents and pay royalties to Universal, which were paid until June 15, 1944, when the judgments herein were vacated; that Whitman had sued Universal in the United States District Court of Delaware for the revocation of the licenses and the repayment of the royalties paid thereunder on the ground that the judgments in the Root appeals had been procured by fraud, and hence Whitman had an interest in the outcome of the present proceeding and should be allowed to participate therein.

On January 22, 1948, pursuant to the designation made by the Chief Justice of the United States on January 16, 1948, we called a conference of the attorneys for the United States as amicus curiae, the attorneys for Whitman and the attorneys for Universal, at which the posture of the cases was discussed and counsel were instructed to propose any legal questions which might be involved preliminary to an investigation into the merits of the proceeding; and subsequently on March 23, 1948, a hearing upon these questions was held.

In the meantime, on February 10, 1948, Universal made return to the order of June 20, 1947, and moved the court to dismiss the rule to show cause thereby imposed upon it, contending, for the reasons hereinafter set out, that no justiciable controversy then existed in these cases; and on February 16, 1948, Universal filed a memorandum in opposition to Whitman's motion to intervene, on the grounds hereinafter described.

On March 2, 1948, Alfred C. Aurich, on behalf of the United States as amicus curiae, filed a statement of ultimate facts relating to the proceedings and the charges of fraud in this case; and on March 8, 1948, Universal filed a reply in opposition thereto and a

[3] In Universal Oil Products Company v. Root Refining Company, 328 U.S. 575, 581, 66 S.Ct. 1176, 1179, 90 L.Ed. 1447, the court said that "a federal court can always call on law officers of the United States to serve as amici."

motion to strike the same from the records of the court.

On April 6, 1948, we issued an order in which the prior history of the cases was reviewed and it was directed (1) that the United States, through the Assistant Attorney General designated by the Attorney General, be authorized to participate in this proceeding as amicus curiae; (2) that the motion of Universal that the statements of the United States as amicus curiae be stricken from the records and the motion that these proceedings be dismissed be denied; and (3) that the motion of Whitman to intervene be granted.[4] We further ordered that in view of the conclusions contained in the report of the Special Master, and the allegations of wrongdoing set forth by the United States as amicus curiae and by Whitman, we deemed it necessary to determine whether Judge Davis was improperly influenced as a member of this court in his action in these cases by the hope of gain or reward, and whether the judgment of the court in these cases was secured by fraud or wrongdoing on the part of Universal or any one acting on its behalf, and to that end we formulated the charges that had been made and that were to be tried as follows:

(a) Whether Judge J. Warren Davis' action in these cases was influenced by the expectation of gain or favors pursuant to an agreement or understanding to that effect with Morgan S. Kaufman.

(b) Whether certain transactions effected in the latter part of 1935, whereby Morgan S. Kaufman advanced the sum of $10,000 to one Charles Stokley, a cousin of Judge Davis, were the means whereby Judge Davis was compensated in whole or in part for his decision favorable to Universal Oil Products Company in these cases, and whether certain other transactions between Judge Davis and Morgan S. Kaufman during the period 1935 to 1938 allegedly relating to the litigation evolving from the bankruptcy of one William Fox, were part of a corrupt and illicit combination between Judge Davis and Kaufman to obstruct justice.

(c) Whether Morgan S. Kaufman was employed or retained by Universal Oil Products Company in connection with these cases and, if so, whether the purpose of such employment or retainer was the expectation of Universal Oil Products Company that Kaufman would exercise or endeavor to exercise an improper influence upon Judge Davis in order to secure favorable judicial action by him in connection with these cases.

We further ordered that the motions and answers filed herein by Universal be accepted as a general denial of all allegations of wrongdoing on the part of the court or on its part.

We further ordered that the trial of the cases be set for hearing before the court, without the intervention of a master, on May 10, 1948, and thence continuously from day to day until completed; and that in the trial of the charges the amicus curiae should have the duty to present to the court the available evidence bearing upon the charges, whether or not in support thereof, to the end that the truth might be ascertained; and that Whitman and Universal should have full opportunity to present evidence bearing on the charges and to participate in the examination and cross examination of witnesses and in the argument before the court, so that the customary procedure of an adversary proceeding might be observed.

We further ordered that the trial of the charges above set forth be consolidated with the trial of the charges set forth in an order of this court of the same date passed in the case of American Safety Table Company v. Singer Sewing Machine Company in the manner hereinafter described in the discussion of that case.

The hearing took place in accordance

---

[4] At the same time we granted a motion of the Skelly Oil Company to withdraw from the case as intervenor. Our predecessors had previously granted Skelly leave to intervene on the ground that it was engaged in litigation over another patent with Universal in the District Court of Delaware, which patent related to the instant cases; and Skelly participated in the argument before us on January 22 and March 23, 1948, but subsequently entered into an agreement of settlement with Universal and asked leave to withdraw.

with the terms of this order and ten days were consumed in the taking of testimony. The evidence was presented to the court by the attorney for the United States as amicus, but full opportunity was accorded and was availed of by the attorneys for Universal and the attorney for Whitman, the intervenor, to examine and cross-examine the witnesses offered by the amicus; and to offer witnesses on their own behalf. At the conclusion of the testimony, the court took an adjournment for one week in order to afford the attorneys an opportunity to prepare their arguments at which the attorneys who desired to speak were heard without restriction as to time.

Before stating the findings and conclusions of fact which we have reached upon the testimony, it is desirable to examine the legal objections raised by Universal to our order of April 6, 1948, under which the proceeding in its present phase has been conducted. They relate, as we have seen, to the jurisdiction of the court to conduct the inquiry, and if that be found to exist, to the propriety of allowing Whitman to intervene as an interested party. Universal's argument on the jurisdictional point is set out in the indented paragraphs which follow.

The jurisdiction of the federal courts is limited by Article 3, Section 2 of the Constitution to "cases" and "controversies" in which the claims of litigants are brought before them for determination by such regular proceedings as are established for the protection and enforcement of rights, or the prevention, redress, or punishment of wrongs; and this jurisdiction is limited to cases and controversies between adverse litigants presented in such form that the judicial power is capable of acting upon them, and pronouncing and carrying into effect a judgment between the parties, and does not extend to the determination of abstract questions or issues framed for the purpose of invoking the advice of the court without real parties or a real case. Liberty Warehouse Co. v. Grannis, 273 U.S. 70, 74, 47 S.Ct. 282, 71 L.Ed. 541. It follows that when by the act of the parties, as by a settlement, an existing controversy comes to an end, the case becomes moot and a federal court is powerless to

act further in the matter. United States v. Alaska S. S. Co., 253 U.S. 113, 116, 40 S.Ct. 448, 64 L.Ed. 808. That is the situation here. The Root appeal presents no case or controversy because Root settled its differences with Universal by a settlement in 1939 and this fact was recognized by the amici when they first approached this court, as the Supreme Court pointed out in Universal Oil Products v. Root Refining Co., 328 U.S. 575, 577, 66 S.Ct. 1176, 90 L.Ed. 1447, for although their clients were hostile to Universal, their controversies with Universal were outside the Root cases and their attorneys secured a standing therein only as amici. Moreover, the Supreme Court on May 29, 1944, in Universal Oil Products Co. v. Globe Oil & Refining Co., 322 U.S. 471, 66 S.Ct. 1110, 88 L. Ed. 1399, declared that the Egloff patent, one of the patents involved in the Root appeals, was invalid, and that the Dubbs patent, the other patent there involved, was not infringed by the refining process employed by Root and the other oil companies sued by Universal. Universal also pointed out that the Dubbs patent had expired. Therefore, Universal contends no controversy prevails in the instant proceeding.

This result is not affected by the attempted intervention of Whitman, since an existing suit within the court's jurisdiction is a prerequisite of an intervention. Kendrick v. Kendrick, 5 Cir., 16 F.2d 744; and furthermore, Whitman does not assert an individual claim for relief either in law or in equity which is an essential basis to a right of action in a federal court. Oklahoma v. Civil Service Comm., 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794; Coffman v. Breeze Corporations, 323 U.S. 316, 323, 65 S.Ct. 298, 89 L.Ed. 264.

Finally it is said that since this court is a Court of Appeals, it has no power in the exercise of its federal jurisdiction to make findings of fact in the first instance and to enter judgments or decrees based thereon.

 This argument completely ignores the inherent power of a court to inquire into the integrity of its own judgments. Such a judgment implies the prior exist-

ence of a justiciable case or controversy between opposing litigants; but when the controversy has been terminated by a judgment, its freedom from fraud may always be the subject of further judicial inquiry; and the general rule that courts do not set aside their judgments after the term at which they were rendered has no application. The matter is not one of merely private concern subject to the action or inaction of the litigants, but is one of vast public importance, so that it becomes immaterial that the injured party may have been derelict in bringing the fault to the court's attention. On this point, the Supreme Court in Hazel-Atlas Glass Co. v. Hartford Empire Co., 322 U.S. 238, at page 246, 64 S.Ct. 997, at page 1001, 88 L.Ed. 1250, where also a charge of fraud was made as to the prosecution of a suit upon a valuable patent in a District Court and in the Circuit Court of Appeals of the Third Circuit, said:

" * * * This matter does not concern only private parties. There are issues of great moment to the public in a patent suit. Mercoid Corporation v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268 [88 L.Ed. 376]; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, [788], 62 S.Ct. 402, 86 L.Ed. 363. Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud."

■ The power inheres in the appellate as well as in the trial court and the former may vacate its own judgment and direct the vacation of a decree of the latter entered pursuant to the mandate of the former. In discussing this question and rejecting the argument that although the courts of appeals have power to permit the trial courts to review a judgment attacked for fraud in a case which the appellate court has reviewed, the appellate court may not review the judgment itself after the expiration of the term, the Supreme Court said in the same case, 322 U.S. at pages 248, 249, 250, 64 S.Ct. at page 1002:

"Equitable relief against fraudulent judgments is not of statutory creation. It is a judicially devised remedy fashioned to relieve hardships which, from time to time, arise from a hard and fast adherence to another court-made rule, the general rule that judgments should not be disturbed after the term of their entry has expired. Created to avert the evils of archaic rigidity, this equitable procedure has always been characterized by flexibility which enables it to meet new situations which demand equitable intervention, and to accord all the relief necessary to correct the particular injustices involved in these situations. * * *

" * * * To reason otherwise would be to say that although the Circuit Court has the power to act after the term finally to deny relief, it has not the power to act after the term finally to grant relief. It would, moreover, be to say that even in a case where the alleged fraud was on the Circuit Court itself, the relevant facts as to the fraud were agreed upon by the litigants, and the Circuit Court concluded relief must be granted, that Court nevertheless must send the case to the District Court for decision. Nothing in reason or precedent requires such a cumbersome and dilatory procedure. Indeed the whole history of equitable procedure, with the traditional flexibility which has enabled the courts to grant all the relief against judgments which the equities require, argues against it. We hold, therefore, that the Circuit Court on the record here presented had both the duty and the power to vacate its own judgment and to give the District Court appropriate directions."

Universal made the same contention as to lack of jurisdiction in this court to conduct an inquiry into the conduct of Judge Davis when Universal was before the Supreme Court in the earlier phase of

the pending case. The Supreme Court, however, brushed aside this contention and made the statement (328 U.S. at page 580, 66 S.Ct. 1176, 1179, 90 L.Ed. 1447) hereinbefore set out, to the effect that a federal court has inherent power to investigate whether a judgment was obtained by fraud, and for this purpose may bring before it by appropriate means all those who may be affected by the outcome of the investigation. It is true that in the same opinion the court reversed the order of this court requiring Universal to pay the fees of the amici as part of the costs; but this was done because property rights were affected by this court's action and it was shown that the master in reaching the conclusion approved by this court had acted at times as an investigator rather than as a judicial officer, and in these respects, had failed to observe "the usual safeguards of adversary proceedings." This decision, however, did not indicate that this court lacked the power to act, but only that in some respects the power had been exercised improperly. This interpretation of the Supreme Court's position is in harmony with its subsequent rejection of Universal's petition for writs of prohibition and mandamus, directed to this court, wherein Universal again advanced the contention that this court had acted in excess of its jurisdiction.[5]

The Supreme Court did not strike down the act of this court whereby the judgments upon the Root appeals were vacated. It said that the question was not before it but that "obviously, a court cannot deprive a successful party of his judgment without a proper hearing." Because of that statement this court, as formerly constituted, on June 20, 1947, struck out its vacating order; and thereafter, in due course, the proceeding before the court as now constituted was recommenced. The subsequent trial has been conducted under the judicial safeguards which obtain in the administration of justice; and although we are told that the evidence we have heard has not differed materially from that presented to the master, we have abstained from examining that evidence or the findings of the master thereon, and have reached our conclusions solely upon the evidence presented at the hearing before us. However, the fact, that an able and impartial lawyer rendered a decision adverse to Universal on the issue of fraud at the former hearing, and that his decision was affirmed by the regular members of this court, has been considered by us in connection with the other facts outlined above as ample justification for proceeding with, the inquiry in its present form. Indeed these facts not only justify the inquiry but impose upon us the duty to make it, even if no party to the original cause should be willing to cooperate, to the end that the records of the court might be purged of fraud, if any should be found to exist.

Our consent to the intervention of Whitman is based, we think, on grounds equally substantial. Whitman (formerly National) has been engaged for many years in refining oil, and in 1930 and 1931 installed in its plants in Ohio and Kansas new equipment for the cracking of oil in the production of gasoline by the method known to the industry as the Winkler-Koch process. Universal charged that this process infringed the Dubbs and Egloff patents, and, as we have seen, brought suit thereon in the District Court of Delaware against Root which was brought to a successful conclusion when the Supreme Court denied Root a writ of certiorari on October 21, 1935. Meanwhile, Universal sued National in the Northern District of Ohio in 1931 on the same patents; was permitted to dismiss this suit without prejudice on February 26, 1935; again sued National in the Northern District of Kansas on the same patents on April 1, 1935, and in that suit claimed that the issue between the parties was res judicata in its favor, because National had participated in the Root cases through membership in the Winkler-Koch Patent Company, a voluntary association of oil companies, including Root, which employed counsel and defended Root

---

[5] As to the right of the court to act on its own motion when it is charged that its judgment has been secured by fraud, see also American Insurance Co. v. Lucas, D.C.W.D.Mo., 38 F.Supp. 896, 921 to 925; American Wood Paper Co. v. Heft, 131 U.S.Append. XCII, 19 L.Ed. 378.

and other users of the Winkler-Koch process. In reply National admitted participation in the patent club, denied that the judgments were res judicata, but subsequently, under the advice of counsel, entered into a settlement with Universal and accepted a license agreement under which it has paid Universal approximately a million dollars.

After June 15, 1944, when this court vacated the Root judgments, National ceased the payment of royalties, and on December 28, 1946, brought suit in the District Court of Delaware (to which Whitman has succeeded) reciting the prior history of the pending proceeding in this court and praying for a judgment cancelling its license agreement with Universal, and granting restitution of the royalties theretofore paid, or in the alternative, the enforcement of the so-called "favored nation" clause in the agreement. Finally, on December 31, 1947, Whitman filed a motion to intervene herein on the ground that an essential element in its case against Universal in the District Court of Delaware, that is, the fraudulent character of the judgments in the Root cases and the complicity of Universal therein, is involved in the pending proceeding and that Whitman, as well as Root, should be allowed to be heard.

Universal, in opposition to the application for intervention, asserts that the fundamental infirmity of Whitman's motion lies in the absence in this proceeding of a case or controversy, and in addition, urges that Whitman has no right to intervene because (1) a party has no right to intervene in a case for the first time in the appellate court; (2) it will not be bound by the judgment herein; (3) there are no equities which should incline the court to exercise its discretion to grant intervention; and (4) Whitman has waited so long after it received knowledge of the facts recited herein before applying for intervention that it is guilty of inexcusable laches.

We have already shown that the power of this court to conduct this proceeding is well established, and its power to allow Whitman to participate also seems to us to be beyond reasonable question. It is true that intervention in a litigated case by a third party usually occurs in the trial court and is usually regulated by statute; but even in the appellate court the process is not unknown, and in the instant case, the significant and controlling circumstance is that although the court is appellate, the proceeding is not so, since it affects the existence of the court itself and partakes of the nature of an original action in that the issues are framed and the testimony is taken for the first time.

Rule 18(5) of this court authorizes intervention in proceedings for the review or enforcement of orders of all administrative agencies, boards or commissions, where the case first enters the federal courts in the Court of Appeals. Procedure under this rule is akin to that approved without rule of court in the First Circuit in Bethlehem Shipbuilding Corp. v. N. L. R. B., 1 Cir., 120 F.2d 126, where it was held, in analogy with the practice of the District Courts under the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, that the Court of Appeals might appropriately exercise the power to grant the privilege of pretrial discovery to the Labor Board in an original contempt proceeding instituted by it for violation of the Court of Appeals decree. The court held that this action was justified by Section 262 of the Judicial Code, 28 U.S.C.A. Section 377, which gives power to all federal courts to issue all writs not specifically provided for by statute which may be necessary for the exercise of their respective jurisdictions and agreeable to the usages and processes of law.

■ Intervention in the District Courts is regulated by Rule 24 of the Federal Rules of Civil Procedure. Upon timely application, it is granted as of right (paragraph a) when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant is or may be bound by a judgment in the action; and it may be permitted upon such application (paragraph b) in the court's discretion when the applicant's claim or defense and the main action have a question of law or fact in common. The present case is fortunately unique and presents a

phase of original jurisdiction, as distinguished from appellate jurisdiction, derived from the inherent power of a federal court to investigate whether its judgment has been obtained by fraud; and we have no doubt that the same considerations which justified this court to issue its Rule 18(5) and also justified the First Circuit to adopt by analogy the Federal Rule of Civil Procedure in contempt cases, authorize us in like manner to apply to this case the principles underlying the Federal Rules of Civil Procedure which regulate intervention in the District Courts.

When the provisions of paragraph (b) of Rule 24 are applied, the intervention of Whitman is clearly permissible and should be granted. The determination by this court of the question whether Universal has been guilty of unclean hands in the Root appeals would necessarily be of great weight in the decision of the same question in the suit between Whitman and Universal now pending in the District Court of Delaware, even if Whitman were not allowed to intervene herein, and would not be technically bound by our conclusions. But there can be no doubt that the question of Universal's complicity in the fraud is common to the instant proceeding and also to that suit, and that if Whitman is permitted to intervene, it will be bound by our finding on that question.[6] It cannot be denied that so far as that suit is concerned, Whitman's interest in our decision is as great as that of Universal and it is reasonable and just to give Whitman, on one side of the issue, the same opportunity to participate as is accorded Universal on the other, especially as the amicus has been enjoined to present all of the evidence bearing on both sides. Any doubt as to the right of Whitman to intervene is dispelled by the broad statement of the Supreme Court when the prior phase of this case was before it, 328 U.S. at page 580, 66 S.Ct. at page 1179, 90 L.Ed. 1447, that when the question is whether a judgment of the court was obtained by fraud the court "may bring before it by appropriate means all those who may be affected by the outcome of its investigation."

This court is entitled to whatever assistance is available to it in its effort to unearth the truth, and it is of no moment that Whitman's application may not have been promptly presented after it was informed as to the facts, since, as pointed out in Hazel-Atlas Glass Co. v. Hartford Empire Co., 322 U.S. 238, 246, 64 S.Ct. 997, 88 L.Ed. 1250, the matter does not merely concern private parties and issues of great moment to the public are at stake.

The important questions of fact in this proceeding are whether Universal employed Kaufman in order that he might influence Judge Davis improperly and secure judicial action favorable to Universal in the Root cases, and whether Judge Davis was in fact so influenced. Our ultimate conclusions of fact based upon a summary of the evidence which we have prepared and filed herein are as follows:

For many years before the Root cases were filed, Davis and Kaufman had been close friends and associates, and the association included Judge Buffington, whose integrity is not assailed in this proceeding, and Kaufman's brother David, who was once United States Minister to Siam. The four men visited in each others' houses and offices, and they spent all or a part of February with each other at the same resort in Miami, Florida in 1935, 1936 and 1937. This intimacy was well known in legal circles in the Third Circuit.

The Root cases were instituted in the United States District Court in Delaware on March 11, 1929. They were of the greatest importance to Universal. In fact, they were test cases and an adverse decision in the Third Circuit would have destroyed the lucrative licensing system which Uni-

---

[6] We have no occasion to decide whether Whitman was bound by the Root decision by reason of participation in the activities of the Winkler-Koch Club, or whether, even if the Root decision was not res judicata as to Whitman, that decision was secured and used by Universal to influence the execution of the agreement of settlement with Whitman in such a way as to justify rescission by the District Court of Delaware. See Universal Oil Products Co. v. Winkler-Koch Engineering Co. et al., D.C.Ill., 27 F.Supp. 161, Universal Oil Products Co. v. Globe Oil & Refining Co., D.C., 31 F.Supp. 665.

versal was establishing amongst the refiners of oil in the United States. Universal was financially very strong and no effort or expense was spared in the litigation, and after the Root cases were won, copies of Judge Davis' opinion were sent to prospective licensees and large sums of money were paid to Universal by divers oil companies for past infringement.

Universal's staff of lawyers in the Root cases was of a very high order, and each lawyer was well qualified for the part he was employed to play. Thomas G. Haight of Jersey City, New Jersey, the leading attorney, had become an eminent and successful patent lawyer, especially in the Third Circuit, after his resignation from the federal bench in 1920. He had been a colleague of Judge Davis in the District Court of New Jersey from 1914 to 1919, and a member of the Third Circuit Court of Appeals in 1919 and 1920; and when he resigned from that court, he was succeeded by Judge Davis. Haight took the lead in the preparation and trial of the Root cases in the District Court and in the Court of Appeals. He was in close touch with Frank L. Belknap of Chicago, the generalissimo of Universal's legal forces in the United States until the latter's death in May, 1933; and Haight was also in close touch throughout the litigation with Hiram J. Halle, president of Universal, who maintained an office in New York.

Hugh M. Morris of Wilmington, Delaware, was United States District Judge in that State from January 27, 1919 to June 30, 1930, and was experienced in patent law by reason of the considerable volume of patent cases in his court. He ruled as District Judge on a motion for a bill of particulars, and on two motions for leave to file interrogatories in the Root cases preliminary to the hearing of the cases on the merits before his resignation took effect on June 30, 1930. On the following day he accepted a retainer of $2500 from Universal of which $208.34 was charged to the Root cases. This employment was in accordance with a previous understanding between him and Haight, acting with Belknap's consent, when it was known that Judge Morris intended to resign. He took an active part in the preparation and trial

of the cases in the District Court, examined one witness and argued the case before his successor, Judge Nields. He attended the argument of the cases in the Court of Appeals but took no active part therein.

Eugene E. Berl of Wilmington took no part in the trial of the Root cases but rendered casual services as local attorney in connection with Judge Morris, and was in a position to furnish all the assistance needed by Universal at the seat of the District Court.

William F. Hall of Washington was very active in the litigation and argued the case in both courts. He confined himself to the scientific aspects of the issues of validity and infringement

Charles S. Thomas of Washington, D. C., participated in the trial of the cases in the District Court and in the preparation of the briefs for the Court of Appeals. He confined himself to questions of patent law.

To this competent group of lawyers Morgan S. Kaufman was added in 1932. He lived in Scranton, Pennsylvania, where he had maintained a law office since 1905. He served as referee in bankruptcy in the Middle District of Pennsylvania from 1913 to 1934. In the period between 1909 and 1939 he was attorney of record in seventeen cases in the Circuit Court of Appeals. On March 4, 1933, Judge Nields appointed him receiver in bankruptcy of S. W. Strauss Company, a mortgage investment company whose principal office was in New York City. From shortly after this appointment, and until the completion of the receivership some time after the year 1940, he maintained his home and his office in New York City where the business of the bankrupt had been conducted. During this period his main occupation, aside from the business of the receivership, was buying and selling securities on the stock market.

None of the lawyers in the Root cases had known Kaufman, except Haight, who was introduced to Kaufman by Judge Davis at a lawyers' dinner in New York in 1930 or 1931. In the spring of 1932, according to Kaufman, Belknap sought an appointment with Kaufman and met him in Philadelphia and retained him as an at-

torney for Universal. Neither the character of the services to be rendered nor the fee to be paid was fixed, but it was understood that Kaufman was not to accept employment from other oil companies. There was no need at that time or later for Kaufman's services in the Root cases, or indeed for any legitimate service that he was competent to render. He did not live in Delaware and could not efficiently perform the work of local counsel in Wilmington where Morris and Berl were both located; and he had neither the training nor the experience nor the ability to understand or present the difficult scientific questions or the legal questions which the Root cases involved.

As a matter of fact, Kaufman rendered no services whatsoever to Universal in the Root cases from the beginning to the end of the litigation. He had no contact with any of the other lawyers except for two casual inquiries by him as to the progress of the litigation and a conference just before the argument of the cases in the Court of Appeals when it was decided not to put his name on the briefs lest Judge Buffington, a warm friend of his brother, would be unfavorably affected. Belknap, however, informed Universal's active lawyers at a pretrial conference in June, 1932, that Kaufman had been retained. Hall understood at the time that Kaufman was employed because he was favorably known to the courts, and Haight understood that Kaufman was employed to prevent his employment by rival oil companies under "what the English called a hold-off retainer."

Halle was told of Kaufman's retention by Belknap before Belknap's death in May, 1933; and shortly thereafter, Kaufman telephoned Halle to confirm the retainer. Halle agreed to Kaufman's continuance, but made no arrangement with him either as to the services to be rendered or the fee to be paid. There is no correspondence or documentary evidence relating to Kaufman's employment by Belknap or Halle. Nevertheless, Halle paid Kaufman a fee of $30,000 in 1935 and 1936 in connection with the Root cases, and the additional sum of $20,000 for legal fees in patent litigation in the Third Circuit in 1936, that is to say, $50,000 in all between October 22, 1935 and December 31, 1936.

The first time that Kaufman approached Halle in person was on April 15, 1935, after the cases had been argued in the Court of Appeals and the decision was still in the breast of the court. Kaufman and Haight called that day to see Halle but what took place is not known for Halle said he could not remember, and Haight and Kaufman did not testify in regard to the conference. At that time the cases were in the hands of Judge Davis who was charged with the duty of writing the opinion of the court. They had been argued in the Court of Appeals on January 7, 1935, before Judges Buffington, Davis and Thompson, and were discussed by the judges in conference at Philadelphia on January 17, 1935. Davis and Thompson favored an affirmance of the decree of the District Court, whereby the patents had been held valid and infringed, while Buffington was for reversal. On January 18, Buffington assigned the opinion to Davis. At the conclusion of the conference on January 17, Judge Davis left by motor for the Battle Creek Sanitarium at Miami, Florida. On his way south he stopped to visit his cousin C. L. Stokley at Mount Dora, Florida. He arrived at Miami on January 30. Judge Buffington and David Kaufman had already arrived at the same hotel and Morgan Kaufman joined them on February 9. David Kaufman left the resort on February 27 but the others remained until the first week in March. On his way north Davis again visited his cousin at Mount Dora.

Judge Davis' opinion in Universal's favor in the Root cases, in which both Buffington and Thompson concurred, was filed on June 26, 1935, and rehearing was denied by the court on August 6, 1935. In August, Kaufman called a second time upon Halle and asked for a fee of $35,000 on the basis of $10,000 a year for the three and one-half years which had elapsed since his retention by Belknap. Halle suggested the sum of $25,000, contingent, according to Kaufman, upon the denial of Root's petition for certiorari then pending in the Supreme Court. On September 12, 1935, a conference took place at Halle's office

attended by Halle, Haight, Richard E. Dwight of New York, representing the Standard Oil Company of California, and W. D. Whitney of New York, attorney for the Shell Oil Company. They agreed that Kaufman should be paid $25,000. A check for this amount, drawn and dated October 18, 1935, was delivered to Kaufman in Universal's office in New York on October 22, 1935, the day after the Supreme Court denied certiorari, 296 U.S. 626, 56 S.Ct. 149, 80 L.Ed. 445. Kaufman gave a receipt covering services to October 1, 1935.

This sum was supplemented on July 27, 1936, when Kaufman called upon Halle and asked him to restore the sum of $10,000 which Halle had cut from Kaufman's original demand. Kaufman had learned that Universal had been paid one million dollars by the Mid-Continent Oil Company in settlement of Universal's claim against it based on the Root decision. Kaufman had not been associated in any way with the Mid-Continent case, but he contended that the Mid-Continent settlement proved the great value of the Root decision. Halle thereupon gave Kaufman an additional $5,000.

The total payments of $30,000 to one who had rendered no legal services may be compared with the following fees received by the lawyers who actually did the work in the Root cases:

| | |
|---|---|
| Haight | $86,300.00 |
| Hall | 54,712.00 |
| Thomas | 24,143.00 |
| Morris | 12,708.00 |
| Berl | 1,073.00 |

Kaufman received additional fees from Universal amounting to $20,000 in 1936. It was decided at the conference of September 12, 1935, to employ Kaufman on the basis of an annual retainer of $10,000. Universal was then contemplating important litigation in the Third Circuit against the Doherty interests. Kaufman was consulted as to the district in which the suit should be brought, and betrayed ignorance of the well known rules of venue in patent cases. Suit was instituted against Crew-Levick Company in the Eastern District of Pennsylvania on January 30, 1936, and a fee of $10,000 was paid to Kaufman in this case on March 18, 1936. He acted as local counsel, filed a complaint and various motions, but did not prepare them. In the same case Haight was paid $3,000, Hall $75 and Morris and Thomas $2,500 each. The case did not come to trial but was dismissed on October 23, 1944, after the Root decision was destroyed by the decision of the Supreme Court adverse to Universal in the Globe case.

Kaufman also appeared as counsel of record in Universal Oil Products Co. v. Derby Oil & Refining Company, D.C., 19 F.Supp. 821, in the New Jersey District. The case was tried on January 7, 1936. Haight and other lawyers appeared for Universal at the trial. It does not appear what, if any, services were rendered by Kaufman in this case.

Kaufman was paid another $10,000 by Universal on December 3, 1936. The explanation offered by Universal for this payment is that it represented Kaufman's retainer for 1937 paid in advance at the end of 1936 at Kaufman's request because he expected large stock market profits in 1937 and desired to avoid a large income tax in that year. At the time, Halle told him that this was the last retainer Universal would pay. On April 25, 1938, Kaufman wrote Halle that he had not received his $10,000 retainer for 1937 but dropped this demand when he was reminded that it had been paid in 1936.

To overcome the reasonable inference from these facts that Kaufman was retained and paid by Universal for a sinister purpose, evidence was offered that Halle was a man of unblemished character, and reliance was placed upon the high professional standing and reputation of the active lawyers for Universal in the Root cases. Reference is also made to the testimony of Halle that he was moved to settle with Kaufman for $25,000 when approached in August, 1935, in order to avoid a law suit such as those brought against Universal for additional fees by former Senator James Reed of Missouri and Charles W. German, each for one million

dollars which Universal settled by the payment of $125,000 and $40,000 respectively. It is also pointed out that subsequent to the Root decision Universal prosecuted infringement of the patents in other circuits, notably in the unsuccessful Globe case, an action which it is contended was inconsistent with the belief that in the Third Circuit Universal had a preferred standing with the court. But these considerations are not persuasive. It is idle to suggest that Kaufman was retained by Universal to prevent his employment by a competitor, for he had nothing to offer an adversary other than the illicit influence which Universal secured for itself. It is frivolous to say that he was paid the first $25,000 to forestall an unjustified suit, for thereafter, without the shadow of a claim or any qualification for the work, he was kept on the payroll and given an additional $25,000 for which no substantial legal services were rendered. No witness for Universal has attempted to explain why the trial of the Globe suit in the Seventh Circuit was undertaken, but it is a fact that in that case Universal urged that the issue was res judicata on account of the Root decision, and also made use of that decision in its settlements with the Mid-Continent Oil Company and with the National Refining Company, Whitman's predecessor. See Universal Oil Products Co. v. Winkler-Koch Engineering Co., D.C., 27 F.Supp. 161; Universal Oil Products Co. v. Globe Oil & Refining Co., D.C., 31 F.Supp. 665.

Upon the whole testimony, our conclusion is that Kaufman was employed or retained by Universal for the purpose and with the expectation that he would exercise upon Judge Davis an improper influence in order to secure favorable judicial action in the Root cases. There is no other reasonable explanation for the relationship or for the large fees that were paid him. He possessed nothing of value to offer Universal, except his intimacy with the members of the court. All phases of the litigation were in the hands of able lawyers, and Kaufman was incompetent to assist them in any legitimate way even if he had tried to do so. In fact, he made no lawful contribution whatsoever.

## Stokley Transactions.

The evidence also indicates that Judge Davis' actions in the Root cases were actually influenced by the expectation of gain or favors, pursuant to an agreement or understanding to that effect with Kaufman. After Kaufman received the first payment of $25,000, certain transactions took place between him, Davis and Davis' cousin, C. L. Stokley, which indicate that Davis was paid for his action in the Root cases. These transactions originated in February, 1935, shortly after the argument, but before the decision of the Root cases while Davis and Kaufman were in Florida. Stokley was a grower of citrus fruit and was threatened with the loss of certain property through foreclosure proceedings instituted by the Town of Mount Dora on account of an unpaid paving assessment of $29,000. Davis learned of this situation when he visited Stokley on his way to Miami, and again on his return trip to Philadephia. He promised Stokley to try to secure a loan for Stokley from a friend. After his return, Davis entered into active correspondence with Stokley and with the town authorities in respect to the title of the property, and an acceptance of a smaller sum in compromise of the assessment. The correspondence went on through the ensuing months, but although the town was pressing for payment, Davis did not make a firm offer of a loan until October 4, 1935, when he wired the town that $10,000, the sum which the town had agreed to accept, had been definitely promised.

On October 24, 1935, two days after Kaufman had been paid by Universal, Davis arranged a meeting in his office at Trenton between Kaufman and Stokley, who then met for the first time. An agreement between them was drawn, under which Kaufman agreed to loan $10,000 to Stokley at 8 per cent. per annum, and Stokley agreed to make certain conveyances of property to Kaufman by which the loan would be amply secured. In November, 1935, Davis sent his law clerk to Mount Dora with Kaufman's certified check for $10,000, payable to the town. The check was delivered and deeds for the property

were received and sent to Kaufman. During this period and thereafter until the Government investigation of Davis had begun, Davis showed great interest in the transaction and Kaufman no interest at all other than to enter into the agreement and advance the money.

The financial condition of Judge Davis in 1935 and 1936 is pertinent to the issues in this case. Davis was insolvent at this time as the result of stock speculations which came to a disastrous end in the financial crash of 1929. He was a client of Samuel Ungerleider and Company, New York brokers, and in 1929 owed them $9,000 which has never been repaid. Morgan Kaufman also dealt in stocks with the Ungerleider firm. He and Davis and Samuel Ungerleider were friends. In 1941, in the course of the Grand Jury investigation of Davis, Kaufman testified that in 1929 he received a bill from the Ungerleider firm for either $9,000 or $14,000 on an account entitled "J. Warren Davis, c/o Morgan S. Kaufman." In the instant proceeding Kaufman said that no such account ever existed and that his Grand Jury testimony was a mistake caused by nervousness.

In the spring of 1937, Davis owed the banks $85,000. He believed that he had a malignant disease and was preparing to go to the hospital for an operation. In this emergency Samuel Ungerleider arranged a composition with the banks for the sum of $37,674.50, and advanced the money to put it into effect. Davis gave notes for the loan and assigned certain insurance policies on his life to Ungerleider. Ultimately Ungerleider recovered certain sums from the proceeds of the policies and from payments by Davis on the loan, leaving a balance of $17,000 which has never been repaid.

Samuel Ungerleider was also helpful in the Stokley transactions. After the $10,000 loan from Kaufman to Stokley was effected, it was learned that Stokley was threatened with foreclosure of certain of his orange groves by reason of an obligation to the Eustis Company, and that he did not have sufficient funds to pay that obligation and also the taxes on the property conveyed to Kaufman. He needed $4,000 to settle the debt. Davis himself, insolvent at the time, borrowed the money from Ungerleider without security on March 12, 1936, and loaned it to Stokley at 8 per cent. per annum, and took certain deeds from Stokley as security. Davis never repaid the $4,000 to Ungerleider. Subsequently, Stokley made certain payments to Davis now to be described whereby we find that money due Kaufman on account of the $10,000 loan was paid to Davis.

Davis did not keep accurate books of account, but his records show that Stokley paid him $200 on June 22, 1936, $200 on July 7, 1936, and $400 in February, 1937, which Davis testified were paid on account of the principal of the $4,000 loan. The evidence clearly shows, on the contrary, that these sums were payments on account of interest on the $10,000 loan from Kaufman to Stokley. These payments correspond in amount to overdue semi-annual payments of interest at 8 per cent. on $10,000, and could not have been made for interest on the $4,000 loan. Interest on that loan in the sum of $320 for the first year was paid by Stokley to Davis on February 9, 1937. Nor were the three sums mentioned payments of principal on the $4,000 loan as Davis testified, because in March and April, 1937, Stokley sent to Davis two checks of $500 each, marked as the first and second payments on the property which secured the $4,000 loan. That the payments in question were actually interest on the Kaufman loan, but paid to Davis, is corroborated by other circumstances. A statement prepared by Stokley's son showed a payment by Stokley to Davis on February 28, 1938 of interest in the sum of $400, the amount of one-half year's interest on the $10,000 loan; but a subsequent statement covering the same period prepared by Stokley for submission to the Grand Jury in the investigation of Davis in 1941 omitted this item altogether. Moreover, the stub of this check in the Stokley checkbook had been completely torn out and destroyed. The change in the statement and the destruction of the stub were obviously designed to conceal this payment to Davis.

Significant also was the testimony of Kaufman given during the Davis investigation that in July, 1936, he received a $200

payment from Stokley on the $10,000 loan. This testimony was obviously designed to offset the evidence outlined above which tended to show that Kaufman was indifferent to the loan and that interest due him had been paid to Davis; but the Kaufman testimony was proved to be false for he went on to say that he deposited the check in a certain bank whose officers testified that no such deposit had in fact been made. In the instant proceeding, Kaufman testified that he had no recollection of the deposit of the check.

Kaufman's indifference to the loan of $10,000 during the period 1935 to the beginning of 1939 is highly significant. He met Stokley at Davis' office and made the loan on October 24, 1935, on the heels of the payment of $25,000 by Universal. However, he manifested no interest in the loan until after the Davis investigation was begun in the spring of 1939. Ordinarily he was persistent in pressing defaulting creditors for payment, but in this instance he took no action although his agreement with Stokley called for annual payments of $2,500, and Stokley made no payment to him at all, principal or interest, until the summer of 1939. Kaufman testified that he wrote Stokley many times before 1939 but this testimony is incredible since none of the letters were produced and Kaufman's secretary, who kept his books, testified that she never heard of Stokley before he made a payment of $600 on the loan on June 18, 1939. Kaufman produced two letters from Stokley dated April 7, 1937 and May 11, 1938, respectively, which referred to the $10,000 loan and his difficulties in making payment. Unlike all the other letters produced by Kaufman, these were written in lead pencil and were not accompanied by envelopes in which they were mailed. Kaufman's real interest in the $10,000 loan did not begin until after the Government had started the Davis investigation and until after Kaufman and Stokley dined together at Davis' house in Trenton in the spring or early summer of 1939. Stokley paid the loan to Kaufman on December 29, 1943, in the sum of $12,000, at which time the interest was reduced to 4 per cent. The $4,000 loan, with interest at 8 per cent., was paid to Davis in full on March 25, 1943.

There can be no reasonable doubt, especially when the timing of the loan is considered, coming as it did immediately after the receipt by Kaufman from Universal of the sum of $25,000, that the $10,000 loan was designed to provide an indirect means for the payment from Kaufman to Davis, and a false front behind which the true nature of the payment was concealed.

### Fox Transactions.

The foregoing conclusions of fact find striking support in convincing evidence that the illicit arrangement between Davis and Kaufman was continued in the Fox bankruptcy cases in the Third Circuit, in which Davis played an active part in the years 1936 to 1938. Fox was a movie magnate, residing in New York, who controlled a number of corporations and amongst them, the American Tri-Ergon Corporation which owned patents deemed to be of very great value for processes relating to the recording of motion pictures and the accompanying dialogue. Suits on these patents were brought in the Second and Third Circuits and resulted in victories for the patentee. Judge Manton wrote the opinion in the Second Circuit in American Tri-Ergon Corporation v. Paramount Publix Corporation, 2 Cir., 71 F.2d 153, and Judge Davis wrote the decision in the Third Circuit, Altoona Publix Theatres v. American Tri-Ergon Corporation, 3 Cir., 72 F.2d 53. Murray Becker, who was Fox's attorney in New York, employed Kaufman as local counsel in the Third Circuit in 1932. Kaufman testified that he was paid $10,000 at the beginning of the litigation and expected to receive additional fees at the conclusion of the litigation since the patents were thought to be worth millions of dollars. The active counsel in this case for Fox were the New York firm of Ward, Crosby and Neale. The decisions in both circuits, however, were reversed when the Supreme Court, first having denied certiorari and later granting it, held that the patents were invalid, 293 U.S. 587, 55 S.Ct. 101, 79 L.Ed. 682; 293 U.S. 528, 55 S.Ct. 139, 79 L.Ed. 638; 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997; 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005.

After this defeat, Fox was unable to pay his debts and moved to Atlantic City in

August, 1935 to avoid his creditors. There he filed a petition in bankruptcy on May 29, 1936, which was referred to Referee Robert E. Steedle, now deceased. Fox testified before the master in 1942 in the investigation in the pending proceeding, and this testimony was admitted in the evidence before us because Fox was too ill to appear. His testimony was denied in important particulars by Davis and Kaufman but we find it to be true. It contains the following account of his subsequent dealings with Davis and Kaufman. On account of these transactions, he was indicted with Davis and Kaufman for conspiracy to obstruct justice and pleaded guilty, and testified for the United States. He was sentenced to serve a year and a day in prison. United States v. Fox, 3 Cir., 130 F.2d 56.

In May, 1936, Fox met Kaufman and Davis in Atlantic City and Kaufman, who had known Fox for ten years, introduced him to the judge. Fox asked them to influence the referee to take favorable action in his case. Davis himself testified that Kaufman later introduced him to the referee, and that during the summer of 1936, he befriended Steedle, took him fishing, invited him to meals and to his daughter's wedding, and asked him whether he would like to become United States District Judge in case Davis should retire. The referee's decisions, however, were unfavorable to Fox and were the subject of the appeals hereinafter discussed.

In July, 1936, Kaufman told Fox in Atlantic City that Davis desired to borrow $15,000 from him, to enable Davis to pay the expense of his daughter's wedding. Fox borrowed the money from his daughter and gave it to Kaufman, who delivered the money in $50 and $100 bills to Davis in Kaufman's apartment in the Bellevue-Stratford in Philadelphia. Later in the year Davis borrowed $12,500 from Fox to enable Davis to restore his daughter's life savings which he had used. Fox borrowed the money from his daughter or his wife and gave it to Davis in $1000 bills, wrapped in newspaper, at the corner of Chestnut or Walnut Street and 12th Street in Philadepphia. Five $1,000 bills, whose numbers were recorded by an Atlantic City bank in which certain Fox corporations had accounts, were paid in May, 1936, to Fox's daughter in Atlantic City; and it was stipulated that the same bills were deposited in a Florida bank by Davis' daughter on April 14, 1937. Davis testified in the prior phase of this investigation that he received these bills from one David Lewis who died in September, 1937. The money was received, he said, in payment of certain loans which he and Mrs. Davis had made to Lewis; but he changed his story as to the time of payment a number of times, placing it in 1933, 1934, 1935 and in the early part of 1936, and did not fix the date of payment finally as July or November, 1936, until he learned that the bills were not issued to the Atlantic City Bank by the Federal Reserve Bank in Philadelphia until May 7, 1936.

After the Davis investigation started, Fox met Davis in the middle of 1940 in the Pennsylvania Hotel in New York and Davis told him that the $1,000 bills had been traced to Davis' daughter. Davis warned Fox that if the Atlantic City Bank had kept records of the numbers of the bills, they were both in serious trouble. Davis met Fox again on March 17, 1941 at the Governor Clinton Hotel in New York City where Davis, according to his own admission, registered under the name of Herman Goldberg. The situation in which the men were placed was again discussed at this meeting. Davis also attended a conference with Fox and Kaufman in the latter's office in New York at which Davis, according to Kaufman's secretary, gave the name of Moon.

At a meeting held in September, 1940, according to Fox, which Davis denied, Davis asked Fox whether he knew David Lewis, above referred to in Davis' explanation of his possession of the $1000 bills. Davis asked Fox whether he could remember paying these bills to Lewis in payment of a loan that Lewis had made to Fox. Davis told Fox that if this was so, it would explain Davis' possession of the money because Lewis had made a payment to him; but Fox took the position that the thing was too complicated and he preferred not to have anything to do with the arrangement. It was in September, 1940 that

Davis appeared before the United States Attorney and gave his final version of the Lewis loan.

Fox engaged Martin Littleton of the New York bar as his attorney, and acting under his advice, made a confession of his transactions with Davis to the United States Attorney in New York, and later pleaded guilty as above stated. Fox claimed that the United States promised him that if Davis and Kaufman should be acquited, he would be given an opportunity to withdraw his plea and stand trial, but that this promise was not kept. See United States v. Fox, 3 Cir., 130 F.2d 56.

Five cases growing out of the Fox bankruptcy proceeding were appealed to this court, and were heard by Judges Buffington, Davis and Thompson in 1936, 1937 and 1938. All of the cases resulted in reversals of the action taken by the District Court, and all of the decisions were in favor of the Fox interests and adverse to the trustee in bankruptcy. The opinions in these cases appear under the name of Judge Buffington but all of them were actually written by Judge Davis. The conclusions announced in these opinions and the methods adopted by the Court in disposing of the cases, as shown by the uncontradicted testimony of the attorney for the trustee, William E. Brown, show indubitably that some malign influence was at work. This will appear, for example, by a comparison of the action of the court in case No. 6260, All Continent Corp. v. Steelman, 3 Cir., 96 F.2d 20, and its action in All Continent Corp. v. Steelman, 3 Cir., 86 F.2d 913, case No. 6253. The first case had its origin in testimony offered by creditors of Fox at a hearing before the referee from which it seemed clear to the trustee that certain assets of Fox were in the hands of the All Continent Corp., a Fox corporation. There was a balance in the All Continent account in an Atlantic City Bank in excess of $60,000 on February 13, 1936 and thereafter more than $200,000 was deposited in the same account during 1936, most of it after Fox was adjudicated bankrupt on May 29, 1936. Accordingly, the trustee secured an order from the referee requiring the All Continent Corporation to turn over its books to the trustee for examination and audit. This order was affirmed by Judge Avis of the District Court of New Jersey on October 15, 1936, 16 F. Supp. 950, and an appeal was taken to this court. On November 13, 1936, the trustee moved this court, which was then hearing the appeal in the other case, to advance No. 6260 for hearing. On December 8, trustee's counsel was notified that case No. 6260 would be heard on December 11, although the printed record and the appellant's brief had not been filed at the time. The court, upon the motion of the trustee, postponed the hearing until December 22, 1936, on which day the case was argued. Nothing was heard from the court until October, 1937, when the trustee was notified that a reargument would be held on December 6, 1937. On that day the case was argued but it was not decided until March 31, 1938, after counsel for the trustee had petitioned the Supreme Court for writ of mandamus directed to this court and requiring it to decide the case. The decision was adverse to the trustee. The Supreme Court granted certiorari, 300 U.S. 643, 57 S.Ct. 492, 81 L.Ed. 860, and thereupon, counsel for the All Continent Corporation surrendered its books for examination.

On the other hand, this court acted with the utmost expedition in case No. 6253, which was an appeal from an order of the District Court which restrained the prosecution in the Eastern District of Pennsylvania of a suit brought by the All Continent Corporation against the trustee and others to remove a cloud on the title to certain stock of Fox which was claimed by the trustee. This order was passed on October 7, 1936, and an appeal was allowed on October 20, 1936. On Friday, November 6, the trustee's attorney was notified that the case would be argued on Monday the 9th. The next day he was served with All Continent's brief and a copy of the record. He appeared in court on Monday and said he was not prepared to argue the case on such short notice. Judge Buffington told him that the appeal had been advanced pursuant to a policy of the court to accelerate hearings in bankruptcy cases. The Court, however, allowed him until Friday, November 13, to file a brief, and argument was set

534

for that day. He was given leave to file a typewritten brief, which he did. At the argument on the 13th he was criticized by Davis for having submitted a typewritten brief and told that it was an imposition on the court, and especially on Judge Buffington. The decision of the court adverse to the trustee was filed on December 1, 1936, 3 Cir., 86 F.2d 913. The attorney for the trustee applied to Judge Buffington for a stay of the mandate and also for an order upon the opposing side to show cause why the stay should not be granted, but both orders were refused. Later a Justice of the Supreme Court issued a stay and when the case came before the Supreme Court, the decision of this court was reversed, 301 U.S. 278, 57 S.Ct. 705, 81 L.Ed. 1085, on the ground that there was probable cause to believe that the suit filed by the All Continent Corporation in the Eastern District of Pennsylvania was a step in a conspiracy between the bankrupt, his relatives and the All Continent Corporation to impede the administration of the bankrupt estate in New Jersey.

In case No. 6605, Hirsh, Newman, Reass and Becker v. Capital Co., 100 F.2d 777, this court also reversed a decision of the District Court which refused to interfere with the examination by a creditor of Fox of certain attorneys of Fox in supplementary proceedings to a judgment obtained by the creditor against Fox.

This court also reversed the action of the District Court in issuing contempt orders against Mrs. Fox and against an auditor in the employ of All Continent when they refused to answer questions put to them at hearings before the referee. The refusal of Mrs. Fox to appear and testify was based on her alleged illness, but this excuse was overruled by the District Judge upon the report of a physician appointed by him to examine the witness. When the case reached this court on appeal, it appointed its own physician who gave contrary testimony. The obstruction to prompt action by the trustee caused by the refusal of the witnesses to testify, and the long delay of this court in rendering adverse decisions to the trustee, are most significant. Mrs. Fox was summoned to testify in August and again in September, 1936. The order of the District Judge adjudging the witness guilty of contempt was made in May, 1937, in which month the appeal was taken. The case was not set down for argument until December 6, 1937, and was not decided until April 2, 1938. Fox v. Capital Co., 3 Cir., 96 F.2d 684. In the auditor's case, the appeal from the contempt order was taken in May, 1937, but the decision reversing the order was not rendered until April 2, 1938, although motions to advance the appeal were made. Leitstein v. Capital Co., 3 Cir., 96 F.2d 23.

■ Our conclusions from these findings as to the issues formulated in this proceeding are that Judge Davis' action in the Root appeals was influenced improperly by Morgan S. Kaufman; that Kaufman was employed by Universal for this improper purpose; and that the Stokley transactions were the means by which Judge Davis was compensated at least in part for his decision. We conclude also that the Fox transactions were undertaken as part of the illicit combination between Davis and Kaufman to obstruct justice, and that these transactions may be considered as evidence to show the existence of the combination which was manifested both in the Root cases and in the Fox litigation. However, we have not considered the Fox episodes in reaching the conclusion that Universal was implicated in the illicit combination so far as the Root cases were concerned. While the actions of the parties in the transactions involved in the two sets of cases are evidence of a common plan between Davis and Kaufman, their subsequent conduct is not admissible to show that Universal was party to the conspiracy in the Root cases.

■ The disposition now to be made of the Root cases admits of no doubt. The records of the courts must be purged and the judgments in Universal's favor, both in this court and in the District Court, must be vacated and the suits by Universal must be finally dismissed. No principle is better settled than the maxim that he who comes into equity must come with

clean hands and keep them clean throughout the course of the litigation, and that if he violates this rule, he must be denied all relief whatever may have been the merits of his claim. Hazel-Atlas Co. v. Hartford Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250; Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293; Mas v. Coca-Cola Co., 4 Cir., 163 F.2d 505; American Insurance Co. v. Lucas, D.C.W.D.Mo., 38 F.Supp. 896, affirmed as American Insurance Co. v. Scheufler, 8 Cir., 129 F.2d 143.

Consequently there can be no question as to the course to be taken with regard to Universal's suits against Root. In Hazel-Atlas Co. v. Hartford Co., supra, the fraud consisted in the publication of an article commendatory of the patent and purported to be written by a disinterested person, but actually prepared by officials of the Company which owned the patent, and in Mas v. Coca-Cola Company, the plaintiff was denied relief because he had forged certain letters indicating the priority of his invention. In both cases the courts did not merely exclude the tainted evidence, but denied the patentee all relief. How much more deserving of condemnation is the conduct of the patentee in the instant case which was directed against the integrity of the court itself.

The judgment of the court is that the mandates in the Root cases be recalled, that the judgments of this court therein be vacated, and that the cases be remanded to the District Court with directions to vacate its judgments therein and dismiss the suits by reason of the fraud practiced upon this court.

No. 6459.

American Safety Table Company v. Singer Sewing Machine Company.

The appeal in this case was decided by a court consisting of Buffington and Davis, Circuit Judges, and Johnson, District Judge, on March 9, 1938, in an opinion by Judge Buffington, 95 F.2d 543. Thereby the decision of the District Court of the Eastern District of Pennsylvania was reversed, and a patent of the American Safety Table Company for a mechanical clutch connecting a sewing machine to a power shaft was held valid and infringed by the Singer Sewing Machine Company. Thereafter, in due time, a motion for reargument and an application to the Supreme Court for writ of certiorari were denied, and on October 17, 1938, the mandate of this court was issued under which an interlocutory decree in favor of the patentee was entered by the District Court and a master was appointed to take account of damages and profits. The proceeding before the master is still pending.

The attorneys who tried the case for American in the District Court were Augustus B. Stoughton and E. S. W. Farnum, Jr., well known lawyers of the Philadelphia bar experienced in patent law; but after the adverse decision American employed Levinsohn, Neiner and Levinsohn, patent lawyers of the New York bar, and later, under circumstances presently to be described, American put the appeal in charge of Morgan S. Kaufman, and he retained Thomas G. Haight and Samuel E. Darby, experienced and successful practitioners of patent law, who prepared the briefs with the assistance of Levinsohn and argued the appeal in this court.

During the period in which the inquiry as to damages and profits was dragging its slow way before the special master, the investigation by the United States into the relationship between Davis and Kaufman, the indictment and trial of Davis, Kaufman and Fox for the obstruction of justice, and the inquiry by this court and its master into the integrity of the judgments in the Root appeals took place. These proceedings have been described in the foregoing opinion, Root Refining Company v. Universal Oil Products Company, and need not be discussed here other than to say that in this case as in the Root cases they constitute part of the background which justifies the present proceeding.

On June 15, 1944, as appears in the foregoing opinion, this court adopted the master's findings of fact and conclusions of law and vacated its judgments in the Root cases; and thereafter, on September 26, 1944, Singer Sewing Machine Company filed a petition for recall of the mandate and reargument of the merits of the case

now under consideration, on the ground that at the time of the argument of the case in this court, there existed a corrupt and illicit combination between Davis and Kaufman to obstruct justice. The petition also charged that Judge Buffington was disqualified to sit in the hearing of the appeal in this case because of the infirmities of old age and his consequent reliance upon Judge Davis. By supplement to the petition, it was charged that Judge Johnson was also disqualified and unfit to participate in the decision of this case on appeal by reason of improper official conduct on his part as District Judge in the Middle District of Pennsylvania, as set out in Report No. 1639 of the Judiciary Committee of the House of Representatives, 79 Cong., 2d Sess. In reply the American Table Company set out the circumstances under which Kaufman and its other attorneys were employed, denied any improper conduct on its part, denied the existence of any unlawful combination between Davis and Kaufman in this case, and also denied that Judges Buffington and Johnson were disqualified to participate in the appeal.

The questions raised by these pleadings were argued on March 6, 1945, before Judges of this court who did not hear the argument on the appeal in 1938, and decision thereon was withheld during the proceedings then pending in this court in Root Refining Company v. Universal Oil Products Company, as outlined in our opinion in that case; and thereafter, on June 20, 1947, an order was passed by this court requiring American to show cause why the relief prayed by Singer should not be granted and further authorizing the Attorney General of the United States to appear as amicus curiae. In reply, American reaffirmed its denial of any improper conduct in this case on its part or on the part of Kaufman, and denied that any of the judges therein were disqualified.

Thereafter, the designation of the judges now sitting herein was made by the Chief Justice of the United States and proceedings were taken in this case which paralleled those taken in the Root cases described in the foregoing opinion. On April 6, 1948, this court passed an order in this case which recited in substance the foregoing facts and authorized the United States, through the Assistant Attorneys General designated by the Attorney General, to participate in this proceeding as amicus curiae. It further ordered, in view of the foregoing facts, that the court deemed it necessary to determine whether Judges Buffington, Davis and Johnson were disqualified from participating in the appeal in this case, and whether the judgment of the court in this case was secured by fraud or wrongdoing on the part of American Safety Table Company or any one acting on its behalf, and to that end, set forth the charges that had been made and were to be tried as follows:

(a) Whether Judge Davis' action in this case was influenced by any expectation of gain or favors pursuant to an agreement or understanding to that effect with Morgan S. Kaufman.

(b) Whether certain transactions effected in the latter part of 1935, whereby Morgan S. Kaufman advanced the sum of $10,000 to one Charles Stokley, a cousin of Judge Davis, and also whether certain other transactions between Judge Davis and Morgan S. Kaufman in the period 1935 to 1938, allegedly related to the litigation evolving from the bankruptcy of one William Fox, were part of a corrupt and illicit combination between Judge Davis and Kaufman to obstruct justice, and, if so, whether Judge Davis was disqualified from participation in the appeal in this case by virtue of that combination.

(c) Whether Morgan S. Kaufman was employed or retained by American Safety Table Company in connection with this case and, if so, whether the purpose of such employment or retainer was the expectation of American Safety Table Company that Kaufman would exercise or endeavor to exercise an improper influence upon Judge Davis in order to secure favorable judicial action by him in connection with this case.

(d) Whether Judge Buffington, by virtue of his physical condition in 1938 and his reliance upon Judge Davis, was disqualified from participation in the appeal in this case.

(e) Whether, in the light of the findings of the Committee on the Judiciary of the House of Representatives in respect of Judge Johnson's conduct in office, Judge Johnson was disqualified from participation in the appeal in this case.

We further ordered that the trial be set for hearing before the court as now constituted without the intervention of a special master, and that in the trial of the charges, the amicus curiae should have the duty to present to the court the available evidence bearing upon the charges whether or not in support thereof, to the end that the truth might be ascertained, and that the parties to the case should have full opportunity to present evidence bearing on the charges and to participate in the examination and cross examination of witnesses so that the customary procedure of an adversary proceeding might be observed. The court further ordered that the trial of the charges set forth be consolidated with the trial of the charges set forth in the order of the court of the same day in Nos. 5648 and 5546, Root Refining Company v. Universal Oil Products Company.

Subsequently a pretrial conference was held in this case at which the question was discussed whether the inquiry should be limited to the propriety of vacating the judgment in this court on the appeal and submitting the case to the court for reargument; and this court concluded and announced with the assent of the parties that the case would be heard upon the issues formulated in the order of April 6, 1948, and that the court would not restrict itself, in case the charges were sustained, to ordering a reargument of the appeal.

It was subsequently stipulated by the parties and by the amicus before the hearing that the testimony of the witnesses and the exhibits in the Root cases should be offered as part of the record in this case, subject to objections on the ground of admissibility, and without limitation upon the right of either party to offer additional testimony.

Certain objections of American to the admissibility against it of certain testimony offered in the Root cases must be considered before we state the conclusions of fact upon which we base our disposition of this case. It is contended that none of the testimony taken before the master in the Root cases is admissible against American because American was not party to that inquiry, and in fact did not know anything about it until long after the testimony was given. However, American raises no objection before us to any of that testimony except that of Judge Davis and Fox, but contends that the objection to their testimony is not overcome by the fact that Davis is dead and Fox is physically unable to appear. American relies on the general rule that testimony in a prior proceeding is not admissible in a subsequent proceeding on the ground of the death or disability of the witness, unless the same issue was involved in both proceedings and the subsequent proceeding is between the same parties or their privies as the first. Wigmore on Evidence, Section 1388. The strict rule that the parties must be the same in both proceedings has been somewhat liberalized where the same issue is involved in both proceedings, and there is some degree of relationship between the party against whom it was offered at the first proceeding and the party against whom it was offered at the subsequent trial.[7]

Wigmore takes the position that the earlier testimony should be admitted in a subsequent proceeding without regard to technical niceties where the former tes-

---

[7] This has been done where the relationship was that of husband and wife, Proulx v. Parrow, Vt., 56 A.2d 623; Bartlett v. Kansas City Public Service Co., 349 Mo. 13, 160 S.W.2d 740, 142 A.L.R. 666; Security Realty & Development Co. v. Bunch, Tex.Civ.App., 143 S.W.2d 687; parent and child, Lyon v. Rhode Island Co., 38 R.I. 252, 94 A. 893, L.R.A.1916A, 983; (father had sued in first action as next of kin, and in his own right in sec-

ond); see Atlanta & West Point R. R. v. Venable, 67 Ga. 697 (admitted against same defendant), and Palon v. Great Northern R. Co., 135 Minn. 154, 160 N. W. 670 (ibid); intestate and administrator, Hutchings v. Corgan, 59 Ill. 70, 71; Indianapolis & St. L. R. Co. v. Stout, 53 Ind. 143, 158; executor and heir, Fredericks v. Judah, 73 Cal. 604; 15 P. 305; principal and agent, see Goodrich v. Hanson, 33 Ill. 498; successors in title

timony was subjected to the test of cross-examination by a party who had the same interest and motive to combat it as the party against whom it is offered in the subsequent trial. Wigmore on Evidence, Section 1388. The reason of course, is that the testimony of the witness is subject to all the tests to which the objecting party would have resorted if the opportunity had been afforded. This broad view has not generally been adopted by the courts, but it may well be that in a proceeding in which the integrity of the court itself is under investigation, technical niceties should be disregarded and that testimony which has been subjected to the usual tests and safeguards should be admitted in order that the truth may be ascertained. However, we do not need to decide that question in this case in view of the conclusion which we have reached as to one of the issues upon testimony which was offered at the hearing to which no objection was taken.

The issue is squarely presented whether American Safety Table Company employed or retained Kaufman on this appeal for the purpose and with the expectation that he would exercise or endeavor to exercise an improper influence upon Judge Davis to secure judicial action from him favorable to American's interest in this suit. We have prepared and filed a summary of the evidence bearing on the issues in the case and as to this issue our ultimate conclusions of fact are as follows:

The setting under which Kaufman was employed is significant. The case was thought to be of great importance by American, especially as its adversary was a powerful corporation and its chief competitor. Its leading attorney in the District Court had been Mr. Stoughton, the dean of the patent bar in Philadelphia who

had practiced law since 1888, and was thoroughly familiar with conditions in the Third Circuit; and when the case was lost, the firm of Levinsohn, Neiner and Levinsohn was also retained. Nevertheless the five Frankel Brothers, who established American and owned its stock, were not satisfied, and Louis Frankel, the president of the corporation, determined to go to New York to confer with the well-known law firm of Otterbourg, Steindler, Houston and Rosen, which had guided the Frankel family in legal matters since 1920. Charles A. Houston of that firm was familiar with patent matters and actually conducted the final proceedings for an accounting before the master in this case. Obviously American did not lack access to experienced men who could aid them in the selection of an additional counsel for the appeal if any was thought necessary.

For this purpose Louis Frankel went to New York shortly after October 18, 1937, when the main brief for the appellant prepared by the Levinsohn firm was filed. But he did not visit either the Otterbourg or the Levinsohn firm. His brother, David Frankel, who lived in New York, took him instead to see Murray Becker the attorney for William Fox of motion picture fame. The visit had to do with business transactions between Fox and the Frankels. In the course of the visit the Frankels and Becker talked about the American suit against Singer, and Becker advised the Frankels to employ Morgan S. Kaufman to handle the appeal for them. Becker was well acquainted with the Third Circuit Court of Appeals, especially the court composed of Judges Buffington, Davis and Thompson. He had been the counsel for the Fox interests in Altoona Publix Theatres, Inc. v. American Tri-Ergon Corporation, wherein an important patent covering

or interest in property, Myers v. Wright, 158 Ga. 418, 123 S.E. 740; Wade v. King, 19 Ill. 301; Cooper v. Smith, 8 Watts, Pa., 536. In re Durant, 80 Conn. 140, 67 A. 497, 10 Ann.Cas. 539, it was held that the testimony of a witness in a divorce proceeding which was damaging to the attorney representing the wife, was admissible in the attorney's disbarment proceedings, since the attorney, though not a party to the divorce case, had an opportunity to cross-examine the witness. See also Charlesworth v. Tinker, 18 Wis. 633, where it was held that evidence given for the defendant in a criminal prosecution for assault and battery was admissible against the complaining witness in a civil suit by her upon the same assault since, under Wisconsin procedure, the complaining witness in the criminal case was in charge of the trial.

motion pictures was sustained by this court on August 6, 1934, 72 F.2d 53, and later lost in the Supreme Court, 293 U.S. 587, 55 S.Ct. 101, 79 L.Ed. 682; 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005. In that case distinguished patent counsel had striven to uphold the patent, and Kaufman had been employed as local counsel. For this service he had been paid a fee of $10,000 and expected to receive an additional fee in case of ultimate success as the patent was thought to be very valuable.

Subsequently Fox filed a petition in bankruptcy in Atlantic City and in a series of appeals in the bankruptcy cases from the District Court of New Jersey to this court, Becker achieved remarkable success for the Fox interests and members of the Fox family before the same judges. In these cases, according to the uncontradicted testimony of William Elmer Brown, Jr., attorney for the trustee in bankruptcy, the administration of the bankrupt estate was greatly hampered and delayed by the decisions of this court. See Steelman v. All Continent Corp., 301 U.S. 278, 57 S.Ct. 705, 81 L.Ed. 1085, and the description of this litigation in the opinion of this proceeding in Root Refining Co. v. Universal Oil Products Company. This litigation was before the Circuit Court of Appeals in 1936, 1937 and 1938, and was in active progress at the time Becker recommended Kaufman to the Frankels in October, 1937.

It was also during this period that Judge Davis' personal financial affairs reached a crisis. He had been insolvent since the market crash of 1929 as the result of speculation in stocks. In 1937 he owed divers New Jersey banks the aggregate sum of $85,000 and was preparing to go to a hospital for an operation as he believed that he had a malignant disease. In this emergency, one Samuel Ungerleider, a New York stock broker, advanced the sum of $37,674.50 for Davis and arranged a composition with his creditors, receiving certain promissory notes inadequately secured from Davis which were never fully paid. Both Davis and Kaufman were customers and friends of Ungerleider.

Davis and Kaufman were on intimate terms of personal friendship, and their relationship was well-known in legal circles in the Third Circuit. Their association included Judge Buffington and Kaufman's brother David; and the four men visted each others' offices and houses and spent all or part of February together in the same hotel in Florida in 1935, 1936 and 1937.

Becker had ample opportunity to learn this situation while the Tri-Ergon and Fox cases were going through the courts of the circuit in the years 1934 to 1938. Subsequently in 1940, when the relationship between Fox and Davis and Kaufman was under investigation, it was Becker who called Kaufman, according to the latter's testimony, to arrange a conference between Davis and Fox.[8]

American added Kaufman to its legal staff in this case under these conditions, and the pertinent inquiries are what legitimate services Kaufman was expected to perform, what compensation he expected to receive and what competence he possessed to act as an attorney in important patent litigation. Kaufman was experienced in bankruptcy matters since he had acted as referee in the Middle District of Pennsylvania, under appointment from Judge Johnson and other judges, from 1913 to 1934. He had long maintained a home and a law office in Scranton, Pennsylvania, but in 1933 the District Court of Delaware appointed him a receiver in bankruptcy of S. W. Strauss Company, a mortgage investment company whose principal office was in New York City. Shortly after this appointment, he set up his home and his office as receiver in New York City and his main occupation, aside from the business of receiver, was the buying and selling of securities on the stock market; and he practically gave up the practice of the law. At no time during his career was he competent to brief or to argue a patent case. This was the situation when American employed him in its suit against Singer.

There is seldom need for local counsel

<hr />

[8] Becker was not called as a witness to explain why he advised the Frankels to employ Kaufman to represent them in a patent case.

to file papers, secure orders of court and make engagements with respect to a case in a court of appeals; and if such a need had arisen in this case, Kaufman, whose headquarters were in New York, was not conveniently available, while Stoughton and Farnum maintained their offices in Philadelphia where this court holds its regular sessions and the clerk's offices are located.

What was Kaufman's function to be? Frankel testified that they employed him as general counsel in the Singer case so that he might in turn employ competent patent lawyers to prepare the reply brief and to argue the case in the appellate court. For this purpose American agreed to advance him $5,000 to pay the lawyers' fees and costs of the appeal, and in addition promised him 25 per cent. of any monies which American might recover from Singer, against which percentage the $5,000 was to be credited. American did in fact pay him $5,000 and he employed Thomas G. Haight of Jersey City, New Jersey, and Samuel Darby of New York City, well known and well qualified patent lawyers who prepared the reply brief with the aid of the Levinsohn firm and argued the case in the Court of Appeals. They were successful in that court, and the patent was held valid and infringed. Upon the return of the case to the District Court, an interlocutory decree in favor of American was issued and the case was referred to a master to fix the damages. For the services in the Court of Appeals Kaufman paid Darby $1750 and Haight $1250 and kept $2000 for himself. Subsequently when certiorari was sought from the Supreme Court and denied, 305 U.S. 622, 59 S.Ct. 82, 83 L.Ed. 397, Kaufman got an additional $1500 from American and paid $500 of this sum to Darby for the preparation of a brief in opposition to the application for certiorari, and kept the remaining $1,000 for himself. In short, the lawyers who did all the actual work received $3500 in the aggregate and Kaufman retained $3000 for himself. This, however, is not the whole story. American's claim against Singer for damages and profits was substantial and Kaufman had been promised 25 per cent of any recovery as an addi-

tional fee. American presented a claim against Singer before the master in the sum of $737,450.62 and the master actually awarded the sum of $40,362.97. American excepted to this allowance as insufficient on the ground that the master had failed to take into account and make any allowance for certain devices of Singer which American claimed to be infringements of the patent. The decision of that question has been held in abeyance pending this proceeding.

Notwithstanding the sums paid Kaufman in this case and the prospect of large additional payments in case of success, Kaufman rendered no substantial legal services in the litigation. His file was produced in evidence and it was found to contain copies of the opinion, briefs and other papers prepared by the patent lawyers. In addition, it contained 61 letters written by him or to him about the case; but they were routine in nature and showed merely that he was kept in touch with the progress of the case, arranged conferences and conveyed information from the Frankels to Darby. Nothing in the file indicates that he made any intellectual contribution to the case or performed any routine service that would not have been performed as a matter of course by the active lawyers in the case if Kaufman had not been employed.

There was in fact no room for him in the case, and no legitimate service that he was competent to perform. There was no need for his services as local counsel, no need for advice from him as to the selection of the lawyers to conduct the appeal, and no ability on his part to present to the court the position of American on the questions of fact or of law involved. He had only one asset to offer his employer, and that was, his personal intimacy and influence with Judge Davis. We cannot escape the conclusion that it was for this purpose, and this purpose only, that he was employed by American in this case.

In the foregoing opinion in the Root cases, we cited the authorities for the principle that one who comes into a court of equity must come with clean hands, and the suitor who fails in this respect will be denied all relief, whatever may be the

merits of his claim. That principle is equally applicable here. Fortunately, venality or even susceptibility to personal influence is rarely found in a judicial officer; and the reports do not disclose instances of the employment of a lawyer by a litigant where it is clearly shown, as in this case, that neither professional competence nor the expectation of professional services inspired the employment, but only the expectation that the attorney's personal influence with the judge would be exerted to win a favorable decision. There are, however, cases where the courts have emphasized the correlative duty of the lawyer to depend solely upon the merits of his client's case and to abstain from all efforts to throw into the scales of justice the weight of his personal influence with the man upon the bench. The legal profession has formulated this primary obligation of the lawyer in the Canons of Professional Ethics of the American Bar Association which provide that a lawyer shall not communicate or argue privately with the judge as to the merits of a pending case, and which denounce any device or attempt to gain from a judge special personal consideration or favor.

The courts enforce these rules by disciplinary action.[9] The attorney who attempts by personal influence to control a judge or jury in their decision in a pending case, or who merely holds himself out as able to do so, whether or not he actually makes the attempt, and whether or not he succeeds or fails in the attempt, in short, an apostate lawyer, who is false to the lawyers' creed that justice shall be undefiled, is ejected from the courts, and as a lawyer ceases to exist. See Ex Parte Cole, C.C.Iowa, Fed.Cas.No.2973, p. 35; cf. In re Doe, 2 Cir., 95 F.2d 386; In re Claiborne, 1 Cir., 119 F.2d 647; In re Shon, 262 App.Div. 225, 28 N.Y.S.2d 872; Werner v. State Bar, 24 Cal.2d 611, 150 P.2d 892; In re Farris, 340 Mo. 1206, 105 S.W.2d 921, 923.

The client who with evil intent employs such an agent fares no better in the instant case. To him also the doors of the courts are closed. From the moment that he ceases to depend upon the justice of his case and seeks discriminatory and favored treatment, he becomes a corrupter of the Government itself and is fortunate if he loses no more than the rights he seeks to obtain.

So it must be in this case with the American Safety Table Company. The decree of the court will provide that its former mandate on this appeal be recalled, that the judgment of the court herein be vacated, and that the case be remanded to the District Court with directions to vacate its judgment and dismiss the suit.

By this action, the records of this court and of the District Court will be purged, and there will be no need to consider whether or not in this case Kaufman actually succeeded in exerting an improper influence upon Judge Davis, or whether upon the evidence before us, excluding the testimony of Davis and Fox, the Stokley and Fox transactions were part of a corrupt and illicit combination between Davis and Kaufman, or whether Judges Buffington and Johnson were disqualified in this appeal.

The court extends its thanks to Mr. Alfred C. Aurich, the attorney for the amicus curiae, for his able and painstaking presentation of the complicated facts in these cases under great pressure. Through his efforts and through the willing cooperation of all the attorneys in these cases the work of this special court was greatly expedited and the period during which it was performed was greatly shortened.

[9] Morgan S. Kaufman was disbarred from practice in this court on November 10, 1944.