543 F.2d 1379
 178 U.S.App.D.C. 66
 TELEPROMPTER CABLE SYSTEMS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
City of Johnstown Pennsylvania and National Cable Television
Association, Inc., Intervenors.
 No. 75-1582.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 2, 1976.
Decided Aug. 26, 1976.
 
 E. Barrett Prettyman, Jr., Washington, D. C., for petitioner. Jay E. Ricks, Robert R. Bruce and Gardner F. Gillespie, Washington, D. C., were on the brief for petitioner.
 Leo I. George, Washington, D. C., with whom John A. Borsari, Washington, D. C., was on the brief for intervenor City of Johnstown, Pennsylvania. Leonard S. Joyce, Washington, D. C., also entered an appearance for intervenor City of Johnstown, Pennsylvania.
 C. Grey Pash, Jr., Counsel, F. C. C., Washington, D. C., with whom Ashton R. Hardy, Gen. Counsel, Daniel M. Armstrong, Acting Associate Gen. Counsel, F. C. C., and Samuel R. Simon, Atty., Dept. of Justice, Washington, D. C., were on the brief for respondents.
 
 
 1
 Stuart F. Feldstein, Charles S. Walsh, John V. Kenny and Samuel Cooper, III, Washington, D. C., were on the brief for intervenor National Cable Television Association, Inc.
 
 
 2
 Peter J. Dooley, Asst. Atty. Gen. of the State of New York, Albany, N. Y., filed a brief on behalf of the State of New York as amicus curiae urging reversal.
 
 
 3
 Michael B. Isaacs and Margaret Adair Sofio, Framingham, Mass., filed a brief on behalf of the Massachusetts Community Antenna Television Commission as amicus curiae urging reversal.
 
 
 4
 Before BAZELON, Chief Judge, TAMM, Circuit Judge, and CHRISTENSEN,* United States Senior District Judge for the District of Utah.
 
 
 5
 Opinion for the Court filed by Circuit Judge TAMM.
 
 TAMM, Circuit Judge:
 
 6
 The background of this case is a lurid episode in corporate and governmental corruption. The facts are not in dispute and need be recited only to furnish a context in which to discuss the legal issues.
 
 
 7
 TelePrompTer (hereinafter TPT or petitioner) began doing business in Johnstown in 1961, after acquiring the interest of an operator who held the exclusive franchise granted by the Johnstown City Council. In January of 1966, the City adopted Ordinance No. 3676, which required open, competitive bidding for an exclusive franchise. The bids of TPT and four competing applicants were opened on February 1, 1966,[1] and on March 2, 1966, the Council awarded TPT an exclusive franchise until December 31, 1975.
 
 
 8
 A subsequent investigation established, however, that on January 24, 1966, several days before TPT submitted its offer, then TPT president, Irving Kahn, met secretly with the mayor and two other members of the Johnstown City Council three members consisting a majority and agreed to pay them $5,000 each for their favorable vote. By reason of this transaction, Kahn and TPT were convicted for conspiracy to violate the Travel Act, 18 U.S.C. § 1952 (1961), which prohibits use of an interstate facility to further unlawful activity.[2] In addition, Kahn was convicted of perjury in violation of 18 U.S.C. § 1621 (1948) in connection with his testimony before the grand jury which had investigated the bribery scandal. United States v. Kahn, 340 F.Supp. 485 (S.D.N.Y.1971), aff'd 472 F.2d 272 (2d Cir.), cert. denied, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973). Following the convictions of TPT and its former president, a major stockholder waged a successful proxy contest which apparently purged TPT of all persons involved in the criminal activity. 52 F.C.C.2d 1263, 1265 n.7 (1975).
 
 I. THE PROCEDURAL BACKGROUND
 
 9
 The Federal Communications Commission (hereinafter "FCC" or "Commission") first examined TPT's misconduct in the context of a radio microwave application in which TPT's character qualifications were, by statute, at issue before the Commission. See TelePrompTer Cable Systems, Inc., 40 F.C.C.2d 1027 (1973). After extensive consideration, the Commission concluded that TPT was generally qualified, stating:
 
 
 10
 (This) company is a long-time leader, its everyday operations giving repeated evidence of its commitment to the evolution of cable television as a promising component of the nation's communications structure. . . . We are persuaded that the company has been turned around and that controlling management has high credentials and the necessary motivation to make internal procedures work to avoid misconduct.
 
 
 11
 Id. at 1035-36. Although the Commission found TPT generally qualified, it specifically reserved the question whether TPT should be disqualified from obtaining a franchise for its Johnstown operation, however, and further directed TPT to file an application for a Certificate of Compliance with respect to the Johnstown system. Id. at 1037. The basis for this directive was the Commission's belief that, with respect to TPT's Johnstown operation, there remained an issue as to the applicability of the doctrine enunciated in Root Refining Co. v. Universal Oil Products Co., 169 F.2d 514 (3d Cir. 1948), cert. denied, 335 U.S. 912, 69 S.Ct. 481, 93 L.Ed. 444 (1949). Broadly speaking, the Root Refining doctrine may be used as a basis for disqualification, under certain circumstances, of an applicant who seeks a public benefit through corruption of, or fraud upon, a judicial or administrative tribunal. On July 6, 1973, TelePrompTer filed the application. See Application for Certification of Compliance, FCC File No. CAC-2785 (1973); J.A. 29.
 
 
 12
 On July 11, 1974, the Commission released an Order designating TPT's application for a hearing on September 24, 1974. 47 F.C.C.2d 947 (1974). TPT responded by filing a Petition for Clarification of Issue, pointing out that the Commission had not set forth the statutory basis for the hearing.[3] In addition, TPT argued that the Commission had failed to define the scope of the hearing, the nature of the proceedings, the remedial options under consideration, or the types of issues to be considered. TPT also noted that the proceeding raised serious questions regarding the nature and extent of the Commission's control over local franchising authorities and concluded by asking the Commission to clarify its Order.
 
 
 13
 On November 8, 1974, the Commission released a Memorandum Opinion and Order, 50 F.C.C.2d 435 (1974), which undertook to clarify certain matters raised in the TPT petition and designated the matter for oral argument on January 14, 1975. The Commission recognized that its authority would be contested and requested the parties to brief that issue. Id. at PP 7-8. Shortly thereafter, the City of Johnstown requested the Commission to defer oral argument on TPT's application until after the City had considered TPT's eligibility to continue operation. In re TelePrompTer Cable Systems, Inc., Motion To Terminate Proceeding, FCC Docket No. 20107 (November 18, 1974); J.A. 256. The City's motion argued that the Commission lacked statutory authority to decide whether TPT's character qualified it for the Johnstown franchise and, further, that the doctrine of Root Refining was inapplicable. J.A. 262-64. This position was supported by the Chief of the Commission's Cable Television Bureau, who maintained that the Commission was required to grant the request.[4] In re TelePrompTer Cable Systems, Inc., Comments on Motion To Terminate, FCC Docket No. 20107 (November 22, 1974). The Commission denied Johnstown's motion. Memorandum Opinion and Order, 49 F.C.C.2d 1423 (1974).
 
 
 14
 Despite the FCC's action, Johnstown appointed a citizen's Hearing Board to review TPT's qualifications. The City had urged the Commission to participate and assured the Commission that "(t)he hearing, which will be initiated by the City of Johnstown, will be an open and full public proceeding affording due process to all concerned." Motion To Terminate Proceedings, supra ; J.A. 259.[5] The Commission declined to participate in the Johnstown hearing, however. After two days of hearings, the three-member Board recommended unanimously that TPT be allowed to continue operations in Johnstown, despite its previous criminal acts. On April 4, 1975, the City Council awarded TPT a new CATV franchise and contemporaneously repealed the 1966 franchise. Johnstown, Pa., Ordinance 4019, April 4, 1975; J.A. 556.
 
 
 15
 On April 10, TPT filed a new application with the Commission for a Certificate of Compliance based on its new franchise. This application was denied, 52 F.C.C.2d 1263 (1975), and this appeal followed. The issues presented resolve, at least to some extent, around the scheme by which the FCC oversees the processes employed by local authorities in selecting cable television franchises.
 
 
 16
 II. LEGISLATIVE BACKGROUND: THE 1972 CABLE RULES
 
 
 17
 In its Cable Television Report and Order, 36 F.C.C.2d 143 (1972) (hereinafter 1972 Cable Rules), the FCC established a "deliberately structured dualism," a regulatory scheme where by local authorities, operating under federal guidelines,[6] are responsible for most aspects of the decision-making function of cable franchising, but applicants are required to obtain a Certificate of Compliance from the Commission. See Cable Television Report and Order, 36 F.C.C.2d 143 (1972). In order to obtain a Certificate of Compliance,
 
 
 18
 the franchisee's legal, character, financial, technical, and other qualifications, and the adequacy and feasibility of its construction arrangements (must) have been approved by the franchising authority as part of a full public proceeding affording due process ;
 
 
 19
 47 C.F.R. § 76.31(a)(1) (1974) (emphasis added). See also Cable Television Report and Order, 36 F.C.C.2d 143, 207-208; Clarification of the Cable Television Rules, 46 F.C.C.2d 175, 190 (1974) (hereinafter "Clarification"). This is the only reference to character qualifications in the 1972 Rules. By way of explanation, the Commission stated:
 
 
 20
 Some governmental body must insure that a franchise applicant's qualifications are consistent with the public interest, and we believe this matter is appropriate for local determination.
 
 
 21
 Cable Television Report and Order, supra at P 179. The Commission thus concerns itself with the quality of the local process, and not with the identity of the particular franchisee chosen, id. at P 177, and it will not interfere with the decision of the local franchising authority so long as the local selection process comports with the Commission's rules. See, e. g., Western TV Cable Corp., 46 F.C.C.2d 272 (1974); Lincoln Cablevision, Inc., 47 F.C.C.2d 80 (1974); Warner Cable of Eastern Massachusetts, Inc., 47 F.C.C.2d 1248 (1974); Calvert Telecommunications Corp., 49 F.C.C.2d 200 (1974). The Commission has further stated that it will not act as "a court of last resort" in review of local franchising decisions, Clarification at P 51, and, assuming the "regularity of action by local officials," will not delve into the process and methodology of local franchise grants except in extraordinary cases. The Commission contends, however, that this is such a case. We note that this is the first case in which the Commission has asserted authority to refuse certificate to a franchise applicant selected by a local franchising authority. TPT Br. at 9, 11.
 
 III. THE COMMISSION'S DECISION
 
 22
 The Commission's refusal to grant TPT a Certificate of Compliance is based upon its assertion that it may take broad remedial action to vindicate the integrity of its processes. For this proposition, the Commission relies primarily upon a doctrine articulated in Root Refining Co. v. Universal Oil Products Co., 169 F.2d 514, 521-22 (3d Cir. 1948), cert. denied, 335 U.S. 912, 69 S.Ct. 481, 93 L.Ed. 444 (1949), and upon its inherent statutory authority recognized in Southwestern Cable supra. Southwestern Cable held that the Commission may take such actions to regulate cable television as are " 'imperative for the achievement of (the) agency's ultimate purposes.' " 392 U.S. at 177, 88 S.Ct. at 2005, quoting Permian Basin Area Rate Cases, 390 U.S. 747, 780, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).[7] Root Refining held that a court has inherent authority to reexamine and vacate judgments arrived at by fraud,[8] and that one who corrupts the processes of government "is fortunate if he loses no more than the rights he seeks to obtain." 169 F.2d at 541. The Supreme Court elaborated upon this doctrine somewhat in Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944):
 
 
 23
 Tampering with the administration of justice . . . involves far more than injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. . . . the public welfare demands that the agencies of public justice be not so important that they must always be mute and helpless victims of deception and fraud.
 
 
 24
 Id. at 246, 64 S.Ct. at 1001. The Commission concluded that disqualification was required in this case in order to preserve the integrity of its certification process, which was inextricably intertwined with the local franchising decision. 52 F.C.C.2d at 1269. The Commission recognized its limited role under the 1972 Rules, but asserted that
 
 
 25
 (w)hen bribery corrupts the local franchising process, the foundation of our certification process is destroyed. Our procedures at the Commission presuppose an investigation into an applicant's qualifications in "a public proceeding affording due process." A franchising process tainted by bribery is not "due process": indeed, it is not a legal "process" at all. A franchise obtained in this manner cannot have any official status before us.
 
 
 26
 52 F.C.C.2d at 1266.
 
 
 27
 The Commission further found disqualification of TPT consistent with its limited role vis-a-vis the local process on the grounds that mere refusal to recognize the tainted franchise would not suffice, since TPT would then be free to reapply for a new franchise and a Certificate of Compliance. FCC Br. at 12-13. In order thus to vindicate its own processes, integrally related with the state franchising procedure, the Commission concluded that "it should neither defer to the decision of the local authority nor permit the wrongdoer to derive any benefit from its misconduct. Rather, 'the guilty party must be deprived of any and all benefits it sought to obtain by its wrongdoing. . . .' " FCC Br. at 13, quoting 52 F.C.C.2d at 1269.[9]
 
 
 28
 TPT does not dispute the validity of this general remedial proposition, but disputes its applicability to the facts of this case. Specifically, TPT maintains that the Commission's processes have been in no way impaired and that the Root doctrine may be invoked only by the tribunal whose processes are tainted by the improper conduct. TPT Br. at 28. The City of Johnstown was therefore the appropriate authority to decide whether to disqualify TPT, but that body properly exercised its discretion in deciding not to do so. See TPT Br. at 28 n. 48. Moreover, TPT reiterates that, even if the local process is so intermeshed with the federal one that corruption of the local process affects the federal one as well, the corruption in this case took place six years before the Commission ever required cable franchises to obtain federal Certificates of Compliance. By the time the Commission adopted the Certificate of Compliance procedure in 1972, the president of TelePrompTer had already been sentenced to jail, the company had paid its fine, and new management had assumed control. Thus, TPT argues, the Commission's processes were in no way affected by that taint on the 1966 Johnstown proceeding. See TPT Br. at 29. In addition, TPT points to the fact that the Commission has found TPT "generally qualified" to be certified and contends that the 1975 Johnstown proceeding awarded the new franchise after an open hearing fully explored the circumstances surrounding the 1966 episode, along with TPT's current legal, character, financial and technical qualifications and past service. Id.
 
 
 29
 It is well established that agencies are themselves bound by their rules and regulations and that they may not deviate on an ad hoc basis. See, e.g., Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); Sangamon Valley Television Corp. v. United States, 106 U.S.App.D.C. 30, 269 F.2d 221 (1959). The lack of any provision in the 1972 Rules for review of local franchising decisions, combined with the Commission's frequent pronouncements respecting franchising, therefore require that the Commission's deviation from its normal standard of non-review be justified.[10] Although the Commission apparently relies most heavily upon the Root Refining doctrine, we may also uphold the Commission's decision upon a finding that the local franchising process failed to conform to the Commission's due process requirements as set out in Section 76.31. Examining the Root Refining doctrine and noting the Commission's apparent satisfaction with the nature of the 1975 Johnstown hearings, however, we conclude that the Commission's action was arbitrary and cannot be justified under either of these principles.
 
 
 30
 The case law tracing the Root Refining doctrine clearly establishes that the power to disqualify the corrupter stems from the inherent power of a tribunal to vacate its own tainted judgments. See Hazel-Atlas Glass Co. v. Hartford Empire Co., supra; England v. Doyle, 281 F.2d 304 (9th Cir. 1960); A. B. Dick Co. v. Marr, 197 F.2d 498 (2d Cir. 1952). See also, Taft v. Donellan Jerome, Inc., 407 F.2d 807, 809 (7th Cir. 1969); 7 J. Moore, Federal Practice P 60.33 at 505-506 (2d ed. 1974).
 
 
 31
 The applicability of the Root Refining doctrine to this case therefore depends upon two assumptions: first, that local franchising decisions are so integrally related to the federal regulatory scheme that any corruption of the local process impacts upon the federal scheme as well; secondly, that this is true even when the corruption of the local process preceded the establishment of the federal regulatory scheme. We agree with the first proposition, and believe that the Root Refining doctrine may justify FCC refusal to award a Certificate of Compliance to a franchisee who has obtained his franchise through corruption of the local franchising process,[11] but we reject the second.
 
 
 32
 The corruption of the 1966 Johnstown decision took place six years before the Commission promulgated the current regulatory scheme. Consequently, in 1966 there was no federal process to corrupt. The corruption was confined to the Johnstown proceeding, and Johnstown was the proper authority to invoke the Root Refining doctrine. In addition, there is no indication that the corruption in any way "carried over" to affect the federal scheme after the passage of the 1972 Rules. The record is clear that all parties involved in the 1966 episode were removed in the ensuing proxy fight and that new management gained control. The Commission argues that TPT benefited from its entrenched position, a result of the tainted 1966 franchise. Although this argument is not without some persuasive force, we believe it would have been more properly directed to the Johnstown Hearing Board. We do not understand the Commission to contest the fairness or integrity of the 1975 Johnstown proceeding; rather, the Commission apparently rests its entire argument upon its interpretation of the Root Refining doctrine as a per se rule of disqualification. We do not interpret it as such, especially when applied to a predominantly legislative, rather than judicial, proceeding like the Johnstown franchising decision.[12]
 
 
 33
 In addition, certain other circumstances of this case argue against the Commission's disqualification of TPT. First, the rule proposed by the Commission lacks standards of application. At oral argument, the Commission was unable to inform the court for how long TPT would be disqualified, except to say that for some period of time an intervening franchise would be required. The Commission also took the position that TPT's purge of all those involved in the 1966 scandal was worth nothing in terms of its eligibility for the Johnstown franchise, despite the fact that TPT was generally qualified to hold FCC certification. From this it is clear that the Commission relied for authority to refuse TPT's request solely on its interpretation of the Root Refining doctrine, and not on a theory of residual authority to review the character of franchisees selected by local entities. Indeed, TPT's present character was not even at issue in this proceeding. Finally, by the time the Commission refused TPT's request for a Certificate of Compliance, TPT had obtained a new franchise from an untainted proceeding by the City of Johnstown, which had carefully reviewed TPT's character qualifications and had fully considered its conduct in 1966.
 
 
 34
 For the above reasons, we must remand this case to the commission.
 
 IV. CONCLUSION
 
 35
 In closing, we wish to make it clear that, by remanding this case to the Commission, we are not "winking at fraud," as the Commission would characterize granting a Certificate of Compliance to TPT; rather, we are simply requiring the Commission to follow the rules it has established for regulating cable television. In order to gain the benefits of allowing localities to make their own franchising decisions, not subject to appellate review before the Commission, the FCC accepted some risk that it might, on occasion, disagree with local franchising determinations. This does not mean that the Commission is forced to award a Certificate of Compliance where the local franchise process is tainted by bribery or other corrupt practices. The due process requirement of Section 76.31 prevents this result by authorizing non-certification of franchisees where local proceedings do not comport with due process. In this case, however, the taint in the process was detected and erased long before the Commission's promulgation of the existing federal regulatory scheme. This does not make TPT's conduct any less repugnant, but it does make it a matter of concern to the decision-making authority whose decision it tainted, rather than to the Commission. The Commission has rested its entire action not on any defect in the Johnstown franchising decision, but on a desire to "vindicate" the integrity of the federal regulatory scheme when that scheme was in reality never affected.
 
 
 36
 The Root Refining doctrine cannot ne stretched to cover the Commission's refusal to grant TPT a Certificate of Compliance under these circumstances. Because the Commission rested its authority entirely on that doctrine, and apparently found no defect with the Johnstown proceeding which would make it fail to meet the standards of Section 76.31, we must remand for further proceedings consistent with this opinion.
 
 
 37
 So ordered.
 
 BAZELON, Chief Judge (concurring):
 
 38
 I concur in Judge Tamm's opinion for the court, but wish to highlight my understanding of the rationale for our decision.
 
 
 39
 We recognize today that the FCC may apply the Root Refining doctrine to protect the integrity of its certification procedure by depriving a party that has gained a certificate of compliance through fraud of all the benefits of that fraud. However, we hold that the Commission may not apply Root Refining in this case because its certification process has not be impaired. Since the Commission played no role in local franchising in 1966 and since the 1966 bribery played no role in the 1975 hearing for which a certificate of compliance is sought, the Commission was not the "deciding tribunal" within the meaning of Root Refining and thus lacks the power to vindicate the fraud.
 
 
 40
 Of course, the case would be otherwise if TPT had bribed the Johnstown officials in order to acquire the 1975 franchise. The Commission then would have authority to deny a certificate of compliance under its reserved powers. 47 C.F.R. § 76.31(a)(1). Or if the Commission were not to become aware of the bribery until after the certificate issued, it would then be able to apply Root Refining to vindicate the integrity of its certification process.
 
 
 41
 One point does, however, require clarification. Judge Tamm mentions the Commission's argument that its processes had been indirectly affected because TPT benefitted in the 1975 hearing from an entrenched position directly attributable to the 1966 bribery. With respect to this argument he concludes, "we believe it would have been more properly directed to the Johnstown hearing board." (Majority Opinion at --- of 178 U.S.App.D.C., at 1386 of 543 F.2d.) This does not mean of course that the FCC can protect its certification procedure through the Root doctrine only if the local government is first consulted on the merits of disqualifying the defrauding party. Rather, it reflects our basic holding that the Commission's processes were not impaired in this case.
 
 
 42
 As a factual matter, the Commission is probably correct that TPT's position before the Johnstown citizenry was enhanced by its past illegality. TPT had become well known in Johnstown after having provided years of service, and it might not have been able to acquire this measure of recognition had it not bribed the local officials in 1966. However, by establishing that TPT was in a stronger position as a result of its bribery, the Commission does not automatically acquire authority to deny TPT a certificate of compliance based on the 1975 hearing. Since the 1975 hearing was not itself tainted by fraud or bribery and afforded the public due process, the certification process was not impaired and under its own rules the Commission was obligated to issue a certificate of compliance. It lacked the power to overrule Johnstown's decision on the merits but could only, as Judge Tamm states suggest to Johnstown that applicants such as TPT ought not be successful.
 
 
 43
 The Commission has in this case attempted to avoid the impact of rules it has itself promulgated. Perhaps the Commission was unwise in delegating away the power to pass on the qualifications of cable television systems. But it has done so, and the City of Johnstown was well within its rights in determining that it preferred continued service from a repentant sinner instead of service supplied by fifty bishops or no service at all.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d)
 
 
 [1]
 TPT did not formally bid in the proceeding, but rather submitted a sealed offer to be opened after all bids were read
 
 
 [2]
 The unlawful activity was in violation of 18 Pa.Stat. §§ 4303 and 4304, and 53 Pa.Stat. § 35911, which prohibit bribery of government officials
 
 
 [3]
 At the time TPT obtained its 1966 franchise, the Commission regulations dealing with CATV left the manner in which CATV operators were selected entirely to state and local entities. See Second Report and Order, 2 F.C.C.2d 725 (1966). In 1972, the Commission for the first time required that, before a cable system commenced operation, it obtain a certification from the FCC demonstrating compliance with the Commission's rules. See Cable Television Report and Order, 36 F.C.C.2d 143 (1972). A conforming application for a Certificate of Compliance must be based on a franchise from the local authority reciting that the qualifications of the cable operator have been reviewed by the authority in a public proceeding affording due process. See 47 C.F.R. § 76.31(a)(1) (1974). Cable systems operating when the new rules were adopted in 1972 were "grandfathered" and were not required to obtain a certificate until the expiration of their current franchise or March 31, 1977. On this basis, TPT filed for a Certificate of Compliance under protest. See TPT Br. at 6; J.A. 29
 
 
 [4]
 Because the conduct motivating the present proceeding involved impropritties (sic ) with the award of (a) cable television franchise by . . . Johnstown . . . and not in connection with any Commission proceeding, and because this Commission does not sit as an appellate court directly overseeing the actions of a city, this aspect of the Root Refining doctrine affords no precedential support for any action the Commission might choose to take. On the contrary, it supports the right of . . . Johnstown . . . to seek to rectify the fraud perpetrated
 In re Teleprompter Cable Systems, Inc., Brief for Cable Television Bureau, F.C.C. Docket No. 20107 (December 6, 1974).
 
 
 [5]
 Notice of the Johnstown hearing was given both in the newspapers, on the local CATV channel, and over the radio. The Johnstown CATV Hearing Board, composed of three members appointed by the Mayor, presided over the hearing. In addition, the hearing was televised live over the CATV facilities, and during the hearing, citizens were repeatedly requested to attend and testify. Apparently, none of the witnesses testified adversely to TelePrompTer
 It is well established that an administrative body once tainted can become untainted through passage of time and change of membership. See, e. g., Pillsbury Co. v. FTC, 354 F.2d 952 (5th Cir. 1966); Fort Harrison Telecasting Corp. v. FCC, 116 U.S.App.D.C. 347, 324 F.2d 379, 384 (1963); Sangamon Valley Television Corp. v. United States, 106 U.S.App.D.C. 30, 269 F.2d 221 (1959). There is no basis to believe, and the Commission does not contend, that the Johnstown proceeding was in any way tainted by the corruption surrounding the 1966 bribery scandal. The only member of the current City administration who had been a councilman in 1966 was the Mayor, who had voted against awarding the franchise to Teleprompter.
 
 
 [6]
 The Commission's regulatory authority with respect to cable television, of course, differs substantially from that for broadcasting in that it is not statutorily derived, but arises from the interface of cable with broadcasting. See United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968); United States v. Midwest Video Corp., 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972). See also Carter Mountain Transmission Corp. v. FCC, 116 U.S.App.D.C. 93, 321 F.2d 359, cert. denied, 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963); Buckeye Cablevision, Inc. v. FCC, 128 U.S.App.D.C. 262, 387 F.2d 220 (1967). Southwestern Cable established that the Commission possesses sufficient authority to regulate some aspects, including which television signals may be carried via cable and which programs must be blacked out, in areas of competition with broadcasting stations. In Midwest Video, a sharply divided Supreme Court extended this concept of "ancillary jurisdiction" to cover a Commission rule requiring cable systems with more than 3,500 subscribers to originate some portion of their programming. The Commission's authority to adopt the regulatory scheme embodied in the 1972 Rules has not yet been judicially tested. That issue is raised here only tangentially on this appeal however, and consequently we do not reach it
 
 
 [7]
 See note 6, supra
 
 
 [8]
 The Root Refining doctrine was applied to administrative agencies in WKAT, Inc. v. FCC, 111 U.S.App.D.C. 253, 296 F.2d 375, cert. denied, 368 U.S. 841, 82 S.Ct. 63, 7 L.Ed.2d 40 (1961)
 
 
 [9]
 In concluding that TPT should be disqualified, the Commission stated:
 We hold as a matter of law that due process could not be afforded through procedures that allowed TPT standing to reapply for the Johnstown franchise as though its entrenched position in Johnstown were not the proximate result of the 1966 bribery.
 
 
 [52]
 F.C.C.2d at 1267
 
 
 [10]
 The Commission has acknowledged that the 1972 rules operate on a " 'go, no-go basis,' " Cable Television Report and Order, 36 F.C.C.2d at 186, and that, if an application for a Certificate of Compliance conforms to the rules, it must be granted. See, e.g., Warren Cable TV, Inc., 47 F.C.C.2d 955 (1974)
 
 
 [11]
 Of course, the existence of the due process hearing requirement in Section 76.31(a)(1) provides an alternative basis for refusing a Certificate of Compliance in such instances
 
 
 [12]
 The Commission states in its brief:
 Nowhere has the Commission concluded that the Johnstown city council is "tainted" or generally disqualified from making judgments with respect to applicants for cable television franchises. The Commission's decision rested solely on TelePrompTer's misconduct. TelePrompTer similarly errs in improperly focusing on the city rather than on itself, i.e., the wrongdoer. The law is clear that the taint of corruption may be removed from a decision-making authority by changes in procedure, members or simply the passage of time. See Sangamon Valley Television Corp., supra; Fort Harrison Telecasting Corp. v. FCC, 116 U.S.App.D.C. 347, 324 F.2d 379 (1963); Pillsbury Co. v. FTC, 354 F.2d 952 (5th Cir. 1966). However, the fundamental principle of the Root doctrine is unmistakable no such procedural unwinding of events is sufficient to remove the taint from the wrongdoer. The remedy for one who corrupts the process of government is denial of all benefits sought.
 FCC Br. at 33-34 n.29 (citations omitted).
 It is not entirely clear from this whether the Commission has entirely rejected any notion that the 1975 Johnstown hearing failed to conform with the due process requirement of Section 76.31(a)(1). The Commission appears to rest its entire case on the Root doctrine, finding that, as a matter of law, no hearing affording TPT standing to reapply for the Johnstown franchise could conform with the Commission's due process requirements. FCC Br. at 14. This absolutist position is not supportable by the Root Refining doctrine.